**AMERICAN SMELTING AND REFIN-
ING COMPANY, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND
HEALTH REVIEW COMMISSION
et al., Respondents.**

No. 73–1721.

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1974.

Decided July 15, 1974.

Daniel M. Gribbon, Washington, D. C., for petitioner.

Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D. C., and A. E. Lawson, Pittsburgh, Pa., for respondents.

Before VOGEL, Senior Circuit Judge, and GIBSON, and WEBSTER, Circuit Judges.

GIBSON, Circuit Judge.

██ Petitioner, American Smelting and Refining Company, upon complaint of the United Steelworkers of America (Union), was charged with a violation of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* (hereafter the Act or OSHA), in allowing the existence of a health hazard at its Omaha, Nebraska plant. Specifically, Petitioner was charged with exposing its employees to hazardous airborne concentrations of lead. The Act's general purpose and its "general duty" clause [1] evidence a clear Congressional purpose to provide employees a safe and nonhazardous environment in which business, including commercial and industrial, operations, is to be conducted.[2]

The complaint of the Union about unsafe working conditions triggered an investigation of plant conditions and monitoring of the working environment present in the Petitioner's plant by personnel of the Secretary of Labor's office. The airborne lead concentrations within the plant varied depending on the type of industrial operation being performed in certain work areas, but the results obtained were adequate to indicate that long-range preventative engi-

[1]. The "general duty" provision of the Act requires the employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

[2]. Congress found that hazardous working environments constitute a burden on interstate commerce causing a loss of man hours of productive activity, loss of workers' health and efficiency, and untold misery and death to its victims. 3 U.S.Code Cong. & Admin. News 5177, 5177–5178, S.Rep.No.91–1282, 91st Cong.2d Sess.1970.

neering practices should be instituted within a six-month period, preceded by immediate administrative controls of approved respirators, rotation of employees, and any other appropriate measures.

The complaint and investigation, with its monitoring tests, resulted in a citation being issued pursuant to § 658(a). The citation was contested by Petitioner, causing the matter to be forwarded to the Commission for processing, which includes an opportunity for hearing. After a hearing, the Administrative Law Judge on March 1, 1972, found that airborne concentrations of inorganic lead at American Smelting and Refining Company's Omaha plant presented "a recognized hazard that [was] likely to cause, if continued unabated, death or serious physical harm to employees, and as such, constituted a violation of Section 5(a)(1) [the general duty provision] of the Act." [3] The Occupational Safety and Health Review Commission (the Commission) directed review and on August 17, 1973, upheld the Administrative Law Judge's finding of a violation.[4] Chairman Moran vigorously dissented. The Petitioner filed this appeal for review of the Commission's order.[5] Respondents are the Commission; Peter J. Brennan, Secretary of Labor; the United Steelworkers of America; and Local 461 of the Union. We sustain the Commission and deny relief to the Petitioner.

The Petitioner, a New Jersey corporation, operates a lead refining plant in Omaha, Nebraska, and employs 390 to 400 workers there. Receiving lead bullion in solid blocks, the plant produces commercial grades of refined lead and lead alloys by separating impurities from the lead. Recovery of the impurities is also accomplished where possible. The Omaha plant, one of the Petitioner's lead refineries, was purchased before 1910 and has since produced refined lead and lead alloys.

Three representatives of the Secretary visited Petitioner's Omaha plant on June 30, 1971, to evaluate the presence of harmful concentrations of airborne lead.[6] The plant's personnel director and plant manager fully cooperated and conducted a tour of the plant. Of the 390 to 400 workers, approximately 95 work in areas that may be affected periodically by high levels of airborne concentrations of lead. Of these 95, 60 work in the lead smelting area, 15 in the retort area (a furnace operation), 10 in the cupel area (another furnace operation), and 10 to 12 in the crane operating area. These are the areas of higher concentrations of airborne lead.

While inspecting the plant, the Secretary's representatives—Charles Adkins, an OSHA Regional Hygienist from Kansas City; Gail Adams, an OSHA Compliance Officer from Omaha; and Howard Ludwig, a United States Public Health Sanitary Engineer from Salt Lake City—observed that all but one of the employees had their company-supplied respirators hanging around their necks, rather than properly wearing them over their noses and mouths. After the tour of the plant, the representa-

3. Secretary, U. S. Department of Labor v. American Smelting and Refining Co., OSHRC Docket No. 10 (Hearing Examiner's Report, filed March 1, 1972).

4. Secretary of Labor v. American Smelting and Refining Co., OSHRC Docket No. 10 (Commission's Decision, filed Aug. 17, 1973).

5. Any person adversely affected or aggrieved by an order of the Commission may obtain review of that order in any United States Circuit Court of Appeals. 29 U.S.C. § 660(a). The Secretary of Labor may also obtain a review or enforcement of the Commission's final order. 29 U.S.C. § 660(b).

6. 29 U.S.C. § 657(a) authorizes the Secretary to enter without delay, inspect, and investigate places of employment at reasonable times. Any employee or representative of employees may request an inspection by the Secretary. 29 U.S.C. § 657(f)(1). The Union thought that the Petitioner was violating a safety or health standard that threatened physical harm or imminent danger due to the results of high concentrations of lead shown in blood tests conducted on certain employees.

tives decided to take air samples of the melting, cupel, retort, and crane areas. Respondent chose seven employees and placed an air sampling pump on each employee. An air sampling pump is a device employed by industrial hygientists to collect contaminants in the air that an individual would normally breathe. Each air sampling pump consisted of a small pump powered by a battery, a rotometer to calibrate the air flow rate through the apparatus, a flow stabilizer device, a transport tube, and a membrane filter or monitor sender from which the sample of air contaminants is taken. The pump and battery were attached to a belt around the worker's waist, the flow stabilizer device was connected to the pump, the tube was connected to the pump, and at the end of the transport tube was connected the membrane filter, which was clipped to the worker's lapel as near the breathing zone of the nose and mouth as possible. The representatives activated the pumps on each of the seven workers, and the pumps were in place for approximately two hours and fifty-seven minutes. This period of time was sufficient to allow each worker to complete at least one complete cycle of his normal work throughout the plant. While the pumps were in place, none of the seven tested employees was wearing his respirator. A pump was not attached to the one worker who was wearing his respirator and working in a large kettle that melts lead. This worker had been chipping solid lead from a dry kettle with an air hammer, and since this job exposes workers to a very high level of lead contaminants, the worker wisely was wearing his respirator. The Secretary's representatives fairly did not sample the air in this work area.

The pumps were carefully calibrated for air flow at the Public Health Service Laboratory in Salt Lake City and at the plant, and each membrane filter was inserted in the apparatus at the plant. The filters were removed and sent to Salt Lake City to analyze them for the lead contaminant. The following results were obtained:

| Employee's Name | His Working Area | Concentration of Lead[7] |
|---|---|---|
| Minard | Furnace | 0.16 mg/$M^3$ |
| Mikinovie | Furnace | 0.22 mg/$M^3$ |
| Marion | Floor | 0.10 mg/$M^3$ |
| Alley | Crane | 0.25 mg/$M^3$ |
| Zandijas | Retort | 2.70 mg/$M^3$ |
| Gulizia | Retort (cupel) | 0.75 mg/$M^3$ |
| Rojas | Retort (cupel) | 2.85 mg/$M^3$ |

The Respondents throughout these proceedings have maintained that the industry recognizes that any lead concentration above .2 mg/$M^3$ constitutes a hazardous condition.[8] The Petitioner counters by claiming generally that air sampling is inferior to periodic biologi-cal testing of each employee's blood and urine and acting upon those results with medical care and transfers to work areas of lesser lead concentrations. Mainly because of its biological monitoring of each employee, the Petitioner argues that there was not a recognized hazard

7. The symbol "mg/$M^3$" represents milligrams per cubic metre of air and is the commonly used measure.

8. This .2 mg/$M^3$ of lead is known as a threshold limit value defined by a Government ex-pert witness to mean a "concentration * * * that an individual could be exposed to for 8 hours a day, 40 hours a week, without any adverse effects."

in the plant causing or likely to cause death or serious physical harm to the employees.

On July 7, 1971, the Kansas City, Missouri, Regional Administrator cited the Petitioner for a serious violation of § 5(a)(1) of the Act. 29 U.S.C. § 654(a)(1). The citation contained the following description of the alleged violation:

> Airborne concentrations of lead significantly exceeding levels generally accepted to be safe working levels, have been allowed to exist in the breathing zones of employees working in the lead melting area, the retort area, and other working places. Employees have been, and are being exposed to such concentrations. This condition constitutes a recognized hazard that is causing or likely to cause death or serious physical harm to employees.

The citation allowed Petitioner 60 days to complete "the implementation of feasible engineering controls to reduce the concentration of the airborne contaminants" and proposed a civil penalty of $600.

On March 1, 1972, Administrative Law Judge Brennan filed an extensive report of 47 pages. He found that .2 mg/M³ of airborne lead concentration is generally recognized by the industry as the safe level, that a "recognized hazard" existed in violation of the general duty clause due to concentrations of airborne lead greater than .2 mg/M³, and that the Petitioner's "preventive program" including biological monitoring, the required use of respirators, and transfers of employees with high levels of lead concentration in blood and urine samples did not negate a finding of a recognized hazard. Having found a violation of the general duty clause, the Administrative Law Judge required the Petitioner to complete feasible engineer-

ing controls to reduce the concentration of airborne lead contaminants to .2 mg/M³, or below within six months from the entry of a final order. He also approved the Secretary's assessment of a $600 fine, specifically finding it was a civil penalty and constitutional.

On August 17, 1973, Commissioner Van Namee, joined by Commissioner Cleary for the majority, upheld the Administrative Law Judge's factual findings and interpretation of the law with one exception. The Commission held that neither it nor the administrative law judges have the authority to rule on the constitutionality of provisions of the Act.

The Petitioner first argues that the work conditions at its Omaha lead refinery did not constitute a "recognized hazard" in violation of the general duty clause. This argument has two facets: (a) the legislative history of the Act purportedly indicates that the general duty clause does not apply to hazards that only can be detected by testing devices; and (b) the Petitioner has a program of protective measures that prevented any likelihood of harm to its employees from airborne concentrations of lead. We reject both arguments and conclude that there is substantial evidence on the record considered as a whole to support the Commission's factual findings and no error of law appears.[9]

Relying on limited though express legislative history, the Petitioner argues that the general duty clause was not intended to cover hazards that can be detected only by testing devices. Since the airborne concentrations of lead in excess of .2 mg/M³ were discovered by air sampling pumps instead of the human senses, Petitioner argues that no recognized hazard existed. In short, "recognized" only means recognized directly by human senses without the assistance of

---

9. 29 U.S.C. § 660(a) adopts the "substantial evidence" standard of review. *See also,* Brennan v. Occupational Safety and Health Review Commission and Interstate Glass Co., 487 F.2d 438, 442 (8th Cir. 1973);

National Realty and Construction Company, Inc. v. Occupational Safety and Health Review Commission, 489 F.2d 1257, 1260 n. 4 (D.C.Cir. 1973).

any technical instruments. The Petitioner relies on a statement made by Representative Steiger on December 17, 1970, just prior to the House roll call enacting OSHA. Representative Steiger said:

> The conference bill takes the approach of this House to the general duty requirement that an employer maintain a safe and healthful working environment. The conference-reported bill recognizes the need for such a provision where there is no existing specific standard applicable to a given situation. However, this requirement is made realistic by its application only to situations where there are "recognized hazards" which are likely to cause or are causing serious injury or death. Such hazards are the type that can readily be detected on the basis of the basic human senses. *Hazards which require technical or testing devices to detect them are not intended to be within the scope of the general duty requirement * * *.* It is expected that the general duty requirement will be relied upon infrequently and that primary reliance will be placed on specific standards which will be promulgated under the Act.

116 Cong.Rec. 11899 (daily ed. Dec. 17, 1970) (emphasis supplied).

█ Although Representative Steiger's statement is unequivocally clear concerning his interpretation of "recognized," it does not follow that his interpretation is correct; nor is it indicative of the entire Congress' understanding of "recognized." We must review the legislative history in further detail.[10]

The Administration bill introduced by Senator Dominick required "employers to maintain the workplace free from 'readily apparent' hazards." 3 U.S.Code Cong. & Admin.News 5177, 5222, S.Rep. No. 91–1282 (91st Cong. 2d Sess.1970 (hereinafter 3 U.S.Code Cong. & Admin. News) However, Senator Javits'

amendment, adopted by the Senate, substituted the words "recognized hazards" for "readily apparent hazards." 3 U.S. Code Cong. & Admin.News at 5222 (1970). Senator Javits added these remarks in Senate Report No. 91–1282 for the Senate Labor and Public Welfare Committee:

> As a result of this amendment the general duty of employers was clarified to require maintenance of a workplace free from "recognized" hazards. This is a significant improvement over the Administration bill, which requires employers to maintain the workplace free from "readily apparent" hazards. That approach would not cover non-obvious hazards discovered in the course of inspection.

3 U.S.Code Cong. & Admin.News at 5222 (1970).

The House of Representatives also debated the wording of the general duty clause. Representative Daniels proposed that the clause require employers to "furnish to each of his employees employment and a place of employment which is safe and healthful." Committee Print, Legislative History of the Occupational Safety and Health Act of 1970, 92d Cong. 2d Sess. at 726–27, 833 (hereinafter Legislative History). Representative Steiger proposed the "readily apparent" language identical to the Administration bill; however, Representative Daniels, changing his position, proposed the "recognized hazards" language of the Senate bill and said:

> Our modified General Duty * * * differ[s] in important respects from the General Duty provision in the Steiger substitute.
>
> The first difference is that my amendment protects against "recognized" hazards while the Steiger substitute protects only against "readily apparent" ones.
>
> * * * * * *

10. For a brief discussion of the legislative history, *see* Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988, 992–96 (1973).

\* \* \* I am afraid that "readily apparent" used in the substitute means apparent without investigation, even though a prudent employer would investigate under the circumstances. A danger, in other words, may be recognized as such in the industry, but may not be apparent to an employer who is ill-informed and does not choose to investigate the danger of the situation. That is not sufficient protection for employees.

Legislative History at 1007.

The House replaced "readily apparent hazards" with "recognized hazards." 3 U.S.Code Cong. & Admin.News at 5229, Conference Report No. 91–1765, Statement of the Managers on the Part of the House (1970). On December 17, 1970, Representative Steiger explained what he thought "recognized hazards" meant, defining it not to include "[h]azards which require technical or testing devices to detect them \* \* \*." 116 Cong.Rec. 1189 (daily ed. Dec. 17, 1970) (quoted more fully *supra*).[11] The House went on to pass the bill with the words "recognized hazards," as originally amended in the Senate. 29 U.S.C. § 654(a)(1).

No court has specifically interpreted the meaning of "recognized hazards." In Brennan v. Occupational Safety and Health Review Commission and Vy Lactos Laboratories, Inc., 494 F.2d 460 (8th Cir. 1974), this court held that "recognized hazards" include "an employer's actual knowledge [and] the generally recognized knowledge of the industry as well." That case was remanded to the Commission to factually determine whether Vy Lactos Laboratories, Inc., had "actual knowledge" so as to constitute a *recognition* of a hazard. However, Vy Lactos Laboratories, Inc., did not interpret "recognized" any further. Also National Realty and Construction Company, Inc. v. Occupational Safety

and Health Review Commission, 489 F.2d 1257, 1265 n. 32 (D.C.Cir. 1973) (hereinafter *National Realty*), did not expressly decide this issue and only held that "recognized" may take into account the standard of knowledge in the industry.

In this case, the Commission by a divided vote has first expressed its view as follows:

It is also clear that Congress by rejecting the readily apparent hazards test and accepting the recognized hazards test in its place intended that non-obvious hazards be within the scope of the general duty requirement. There can be no question that non-obvious hazards include those that can only be detected by instrumentation.

Chairman Moran dissented. He first said that Senator Javits' views, including his approach to "non-obvious hazards," were expressed two months before enactment of OSHA and before a conference committee report which "reconciled the differing versions of the general duty requirement." Chairman Moran placed heavy reliance on the fact that "[n]o Member of the House of Representatives or the Senate, at anytime subsequent to the conference committee report took issue with Representative Steiger's view that the general duty clause would not cover hazards requiring technical or testing devices to detect them." (footnote omitted). The fact that no senator or representative expressed a view on Representative Steiger's comments does not necessarily compel a conclusion that Congress agreed with Representative Steiger.

■ We find Petitioner and Chairman Moran's views unpersuasive. Looking to the words of the Act itself, "recognized hazards" was enacted instead of "readily apparent hazards." From the commonly understood meanings of the

---

11. Commentator Richard S. Morey says: "Steiger further suggested that specific standards alone were the appropriate way to regulate hazards not detectable by the senses [Legislative History at 1217]. Steiger's limitation is neither confirmed nor contradicted elsewhere in the legislative history." Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988, 996 n. 40 (1973).

terms themselves, "recognized" denotes a broader meaning than "readily apparent." The remarks of Senator Javits demonstrate that non-obvious hazards were intended to fall within the meaning of "recognized hazards." Further, the House earlier had the opportunity to accept Representative Steiger's proposal of "readily apparent," but chose not to. Undoubtedly, it is clear that Representative Steiger desired that the general duty clause be limited to "readily apparent hazards." We think that it is also clear that Representative Steiger according to his comments on December 17, 1970, interpreted "recognized hazards" to mean apparent only to the human senses. In short, we conclude that Representative Steiger interpreted "recognized hazards" in the same manner that he would have interpreted "readily apparent hazards," but that Congress decided otherwise by enacting the words "recognized hazards" with its meaning in the context of Senator Javits' and Representative Daniels' statements.

We further think that the purpose and intent of the Act is to protect the health of the workers and that a narrow construction of the general duty clause would endanger this purpose in many cases. To expose workers to health dangers that may not be emergency situations [12] and to limit the general duty clause to dangers only detectable by the human senses seems to us to be a folly. Our technological age depends on instrumentation to monitor many conditions of industrial operations and the environment. Where hazards are recognized but not detectable by the senses, common sense and prudence demand that instrumentation be utilized. Certain kinds of health hazards, such as carbon monoxide and asbestos poisoning, can only be detected by technical devices. 29 C.F.R. §§ 1918.83(a) and 1910.93a. The Petitioner's contention, though advanced by arguable but loose legislative interpretation, would have us accept a result that would ignore the advances of industrial scientists, technologists, and hygienists, and also ignore the plain wording, purpose, and intent of this Act. The health of workers should not be subjected to such a narrow construction.

Chairman Moran also based his dissent on the rationale that the use of the general duty clause for the type of alleged violation in this case circumvents the spirit and purposes of the Act, which places much reliance on the promulgation of specific standards. *Cf.* Brennan v. Occupational Safety and Health Review Commission, 491 F.2d 1340, 1343 (2d Cir. 1974). Pursuant to 29 U.S.C. § 655(a), the Secretary must promulgate specific standards for the safety and health of employees. That section establishes a complex procedure whereby the Secretary may request the appointment of an advisory committee to promulgate a specific standard; interested persons may object to the standard; a hearing may be held; the Secretary may promulgate, modify, or revoke the specific standard; and an employer can be granted a temporary order or variance from the specific standard. 29 U.S.C. § 655(b). The Secretary under 29 U.S.C. § 655(c)(1) also has the authority to enforce emergency temporary standards if the health of employees is subject to grave danger.

Chairman Moran argues that the Secretary's use of the general duty clause renders the variance procedure unavailing, allows little advance warning to the employer of what the Government considers a safe and healthful working place, establishes standards on an *ad hoc* basis, renders the use of the temporary emergency standards provision a nullity, and extends the general duty clause beyond its limited purpose for coping with hazards that are obvious and admitted by all concerned and for which no specific standard has been promulgated. This argument is based on sounder

---

12. 29 U.S.C. § 655(c)(1). If an emergency exists, as defined by the Act, the Secretary may promulgate and enforce a temporary emergency standard.

grounds than the legislative history contention.

■ Generally, Chairman Moran's analysis is sound. The Act does focus on the promulgation of specific standards [13] and an elaborate procedure involving all interested parties in fairly arriving at those standards. Though the ancient ills of the lack of safety in certain industries are well documented,[14] this Act is admittedly a new approach to insuring a safe and healthful working place. In the past, our law, both state and federal, has placed primary reliance on tort liability in an attempt not only to compensate victims, but also to encourage employers to provide a safe and healthful working environment. *National Realty, supra,* 489 F.2d at 1260 n. 6. The Act wisely understands that the correction of unsafe conditions requires a transition period in which standards may be agreed upon. Section 655(a) specifically provides for a two-year period in which the Secretary had to promulgate specific standards according to a national consensus. The use of the general duty clause ordinarily should not be available when a specific standard has been promulgated. Also, in an emergency situation, the Secretary can proceed under the procedure of an emergency temporary standard. 29 U.S.C. § 655(c)(1). Yet we think that the general duty clause should be available at least under the facts of this case in which a specific standard was under review and in which the Petitioner was allegedly violating a health standard that had been recognized nationally for many years.

■ In this case, we cannot agree with either Petitioner or Chairman Moran that the general duty clause should not have been available for citing the alleged violation. On April 28, 1971, the entire Act became effective. On May 29, 1971, the Secretary published in the Federal Register the standard of .2 mg/$M^3$ of maximum allowable concentrations of airborne lead particles, 36 Fed. Reg. 10466 (1971), which became effective August 27, 1971. 28 C.F.R. § 1910.-93, Table G–2. The Secretary's representatives inspected the Omaha plant on June 30, 1971; the citation was issued on July 7, 1971; and a pretrial hearing was held on September 28, 1971.

Chairman Moran claims that the Secretary "jumped the gun" in issuing this citation under the general duty clause. That observation may well be apt in certain cases, but not in this one. The evidence in this case strongly demonstrates that .2 mg/$M^3$ of airborne lead has been a nationally recognized standard of safety for years. Although the Secretary could be said to have "jumped the gun" in relation to enforcing a specific standard under consideration as a violation of the general duty clause, he certainly did not "jump the gun" in recognizing that the national standard of .2 mg/$M^3$ of airborne lead has been recognized as the safe level. This is not a situation in which a new danger is involved or in which there is any serious debate on a national standard of industrial health.

A brief understanding of the hazards of industrial lead poisoning is necessary to place this issue in perspective. In short, lead has been known for years as a heavy metal poison and in excess affects a myriad of bodily functions. The Senate Report of the Labor and Public Welfare Committee states that "[o]ccupational diseases which first commanded attention at the beginning of the Industrial Revolution are still undermining the health of workers" and that "[s]ubstantial numbers, even today, fall victim to ancient industrial poisons

---

13. *Cf.* Brennan v. Occupational Safety and Health Review Commission, 491 F.2d 1340, 1343 (2d Cir. 1974).

14. The Senate Labor and Welfare Committee reported that "the number of disabling injuries per million man hours is today 20%

higher than 1958." 3 U.S.Code Cong. & Admin.News at 5178 (1970). Over 14,500 workers are killed annually due to industrial accidents and over 2.2 million workers are disabled. 3 U.S.Code Cong. & Admin.News at 5178 (1970).

such as lead and mercury." 3 U.S.Code Cong. & Admin.News at 5178 (1970). Dr. Robert A. Kehoe [15] in a chapter titled "Industrial Lead Poisoning" in a recognized book in this field, Industrial Hygiene and Toxicology, Frank A. Patty, editor, stated in 1962 that severe forms of industrial lead poisoning are seen less frequently now in the United States, but that partial and temporary disability among a large number of workmen continues in a wide variety of industrial occupations. He wrote that few types of occupational exposure to lead offer insurmountable or even serious obstacles to modern engineering methods and that technical skills applied to the problem of production should also be applied to the problem of safe specifications for exposure to lead contamination.

Dr. Kehoe at trial and in his chapter explained that the danger of industrial lead poisoning is mainly through inhalation. He further said in his chapter that "it is feasible to express the general magnitude of the lead hazards of a plant * * * in terms of the lead content of sufficient numbers of properly selected air samples, and to anticipate with reasonable accuracy the results of exposure thereto." *Patty, supra* at 950.[16]

In his chapter written in 1962, Dr. Kehoe further stated that .2 mg/M³ of lead in the air of workrooms is the accepted standard at which "cases of disabling lead intoxication will not occur among the men who work many years on the usual schedule and in such workrooms, and cases of questionable or mild intoxication will occur only rarely, if at all." *Patty, supra* at 952. Dr Kehoe, the Petitioner's expert, also stated at trial: ".2 is the thing that we're quite prepared to accept. This is our standard in this country, .2." [17] He further said that "[i]f it was an average higher than this, I would regard it as unsafe."

Although Petitioner makes certain other arguments concerning the .2 mg/M³ lead standard, no expert of Petitioner contended that this standard was not the acceptable one for the industry. In fact, the record shows that two of Respondents' experts at trial, seven experts through their books introduced at trial by Respondents (including Dr. Kehoe), and one of Petitioner's experts (Dr. Kehoe) agreed that .2 mg/M³ of lead is the acceptable nation-wide standard.

The air sampling tests conducted on the seven employees demonstrated that pumps attached to five employees showed concentrations of lead greater than .2 mg/M³. Rojas' sample was 14¼ times greater than .2 mg/M³ of lead, Zandijas' sample was 13½ times greater, Gulizia's sample was 3¾ times greater, and Alley and Mikinovie's samples were slightly higher. The expert testimony, including Dr. Kehoe's, indicated that air sampling is a scientifically acceptable manner of detecting hazardous concentrations of airborne lead. In light of the heavy concentrations of airborne lead detected,[18] we think that any discrepancies in testing as advanced by Petitioner must fail. There was con-

---

15. Dr. Kehoe, a physician in the occupational health field who began work "on the lead problem in a systematic way in 1924," was an expert witness for the Petitioner. The chapter referred to in the text was introduced into evidence at the hearing by the Secretary.

16. Dr. Kehoe, according to his testimony and in his article, however, prefers to rely on biological monitoring as an industrial hygienic measure to protect workers from lead poisoning.

17. Some other countries have adopted a more restrictive standard. For example, according to the American Governmental Industrial Hygienists, the following countries have established these limits of concentration: Soviet Union, .01 mg/M³; Czechoslovakia, Poland, and Japan, .05 mg/M³; and Great Britain and Yugoslavia, .15 mg/M³.

18. Many employees also worked a 6-day week or 48 hours, which would lower the .2 mg/M³ of lead standard to some lower threshold limit value. That standard of .2 mg/M³ is calculated on an eight-hour day and 40-hour week. The ceiling concentrations promulgated by the Secretary also assume an eight-hour work shift and a 40-hour week. 29 C.F.R. § 1910.93(a)(2).

siderable evidence to prove that there was a *nationally recognized standard* of .2 mg/M³ of lead and that this standard was violated by Petitioner.

In light of the above evidence, we reject the position that use of the general duty clause in this case destroys the spirit and purpose of the Act. Though a specific standard for concentration of lead was under consideration at the time the Secretary cited the Petitioner for the alleged violation, the standard for airborne lead relied upon by the Secretary had been recognized for years. Dr. Kehoe's chapter agreeing on that same .2 mg/M³ of airborne lead was written in 1962. Lead poisoning is an ancient ill, not a new danger for which new standards and technology would have to be developed. The general duty clause should still be available for use by the Secretary, when an employer is violating a standard of health concerning a well-known industrial ill that is recognized as a hazard by the industry through its own nationally accepted criteria, even though a specific standard is under consideration at the time the Secretary cites an employer for violation under the general duty clause.

The Petitioner's second major contention is that it has instituted many protective measures that prevent the likelihood of harm to the employees. We agree with the Administrative Law Judge that Petitioner's program has not reduced the likelihood of serious physical harm.

Petitioner does have a program to attempt to eliminate the dangers of lead poisoning. It has spent over $400,000 since 1960 on various engineering controls to reduce airborne lead contamination. Industrial hygienists and physicians are employed. Respirators are supplied, but admittedly are awkward to wear and seldom used.

Most important in the Petitioner's view is a reliance on a biological monitoring program, which involves the testing of each employee's blood and urine to determine the concentration of lead. Dr. Nelson, the Petitioner's Director of Environmental Sciences, stated that this testing is "a far more effective way of securing the safety of employees." Dr. Kehoe prefers biological monitoring, since air measurement "is not a standard which we regard as crucial in relation to the individual." For as yet unexplained reasons, differing individuals can be exposed to higher amounts of lead without becoming ill. The candid Dr. Kehoe, however, had this exchange with the Administrative Law Judge:

> [Administrative Law Judge]: Which procedure, Doctor, in your opinion would most greatly detect a change in the lead environment of a workplace, biological sampling or air sampling?

> [Dr. Kehoe]: Either one. I don't know that there is too much to choose from in this. But what I, as a physician am concerned with is John Doe.

Although a carefully conducted biological monitoring system might prevent the likelihood of lead poisoning harm to employees, we think it was more than reasonable for the Secretary to rely on the effective and efficient air sampling method. In addition, the disadvantages of the biological sampling system are demonstrated in this case. About 10% of employees tested from 1970–71 were found to have unsafe levels of lead concentration in their blood and urine,[19] yet generally these employees were not tested frequently enough, according to Petitioner's expert testimony, to ascertain whether they should be changed to another working area in the plant. In fact, the plant manager had no direct involvement with the monitoring plan. The plant's physician did not "follow up" with what happened to individual employees who had high concentrations of lead in their blood and urine. Further, disruption of employees' working habits and the plant

---

19. Lead concentration in blood in excess of .08 milligrams per 100 grams of whole blood is considered unsafe, and .20 milligrams of lead per liter of urine is considered unsafe.

operation would result from transferring employees to new positions within the plant where exposure would be lessened. Most significantly, the record does not indicate that any employee was transferred due to high levels of lead concentration discovered by biological monitoring. The biological monitoring did not eliminate or even reduce the hazard; it merely disclosed it. Although testing of the blood and urine is the most important test for each individual, the use of air sampling tests is the most efficient and practical way for the Secretary to check for a hazard likely to cause death or serious physical harm to the workers as a group. We think it also the most efficient manner for the employer to check the existence of a hazard. We do not intend to minimize the importance of the biological monitoring program; obviously, medical examinations of the individual are the most significant manner of assuring safety of the *individual* worker, provided that remedial steps are taken at the first indication of a hazardous concentration of lead accumulating in the blood and urine of a worker. The evidence showed that each human responds differently to exposure to lead. Yet we think that the safety of the workers and the practicality of detecting unsafe levels of airborne lead concentrations are best served by the air sampling method. Workers should not be subjected to hazardous concentrations of airborne lead; biologi-

cal monitoring should complement an industrial hygiene program for clean or at least safe air, but is not a substitute for a healthful working environment.

In addition, the Petitioner knew or should have known that the respirators would not reduce the likelihood of serious physical harm to the employees. During the unannounced tour of the plant by the Secretary's representatives, only one employee was properly wearing his respirator. The reasonable inference is that employees rarely used the awkward and uncomfortable respirators. It was reasonably foreseeable to the Petitioner that the respirators would not be properly worn.[20] We hold that there was adequate evidence on the record considered as a whole that the biological monitoring program would not prevent a likelihood of harm to employees.[21]

The Petitioner also argues that the $600 assessed pursuant to 29 U.S.C. § 666(b), though labeled a civil penalty, is punitive in nature and an unconstitutional abridgment of Petitioner's right to criminal enforcement only through the courts. Civil penalties are not uncommon in federal law, and Congress here clearly intended to create a civil sanction. Helvering v. Mitchell, 303 U. S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917 (1938).

Affirming the decision of the Commission, we deny relief to Petitioner.

---

20. The Regulations require the use of respirators "[w]hen effective engineering controls are not feasible." 29 C.F.R. § 1910.-134(a)(1). The control of airborne contaminants must first be "accomplished as far as feasible by accepted engineering control measures." 29 C.F.R. § 1910.134(a)(1).

21. This court has held that "[n]either the general duty clause nor section 17(k) requires any actual death or physical injury for a violation to occur." Brennan v. Occupational Safety and Health Review Commission and Vy Lactos Laboratories, Inc., *supra*, 494 F.2d at 463. There was no evidence in the record that any employee was suffering

from any form of lead poisoning. Of course, there was evidence, as described above, that many employees had high concentrations of lead in their blood and urine. The fact that no employee was shown to be sick from lead poisoning does not mean that the high levels of airborne lead found may not result in future serious physical injury. Although a *prima facie* case under the general duty clause *does not require the showing of death* or serious physical harm, evidence of such actualities is admissible to indicate actual knowledge by the employer of a recognized hazard. Brennan v. Occupational Safety and Health Review Commission and Vy Lactos Laboratories, Inc., *supra* at 464.