576 F.2d 948
 6 O.S.H. Cas.(BNA) 1661, 1978 O.S.H.D. (CCH) P 22,798
A. E. BURGESS LEATHER CO., Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondent,
and
Secretary of Labor, Party of Interest.
 No. 77-1146.
 United States Court of Appeals,
First Circuit.
 Argued Oct. 5, 1977.
Decided June 15, 1978.
 
 Charles B. Swartwood, III, Worcester, Mass., with whom Mountain, Dearborn & Whiting, Worcester, Mass., was on brief, for petitioner.
 John A. Bryson, Washington, D. C., Atty. with whom Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Michael H. Levin, counsel for Appellate Litigation, and Allen H. Feldman, Asst. counsel for Appellate Litigation, Washington, D. C., were on brief, for Secretary of Labor, respondent.
 Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, CRARY, District Judge.*
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 After an inspection of its plant, A. E. Burgess Leather Co. (Burgess) was cited on February 4, 1975, with a nonserious violation of section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2). A hearing was held before an administrative law judge, which resulted in a finding of no violation. On appeal, the Occupational Safety and Health Review Commission reversed the ALJ and found that Burgess had violated the Act, although no penalty was assessed. Burgess seeks review in this court pursuant to 29 U.S.C. § 660(a).
 
 
 2
 Burgess manufactures specialty leather products at its plant in Grafton, Massachusetts. About 25% of its annual sales of $600,000 come from items cut out on its "beam dinkers," a kind of press which drives a hand held die down into a piece of leather positioned on a block. The operator activates the dinker by means of a foot pedal while holding the die upright in one hand and, at least in some cases, positioning the leather with the other. A skilled operator can punch up to 3500 pieces of leather an hour. Burgess has used four to five of the machines since 1920, and has never experienced an injury to an operator of sufficient severity to cause lost time from work, although an operator once cut her finger when the hand positioning the leather came too close to the die and was pinched underneath it. The beam comes down with considerable force, however, and could crush or slice off a finger if one were trapped either on top of or under the die as the dinker came down.
 
 
 3
 Acting pursuant to 29 U.S.C. § 654, the Secretary of Labor has promulgated the safety and health standard at issue here, codified at 29 C.F.R. § 1910.212(a) (1), which declares:
 
 
 4
 One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are barrier guards, two-handed tripping devices, electronic safety devices, etc.
 
 
 5
 29 C.F.R. § 1910.212(a)(3) further provides:
 
 
 6
 Point of operation guarding.
 
 
 7
 (i) Point of operation is the area on a machine where work is actually performed upon the material being processed.
 
 
 8
 (ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.
 
 
 9
 The Commission argued that the beam dinkers in Burgess' plant violated this standard because the operator's hands were within the "danger zone" of the "point of operation" during the "operating cycle." In order to be in compliance with the Act, the Commission believed that the dinkers had to be equipped with some device, such as a two-handed control, that required both hands of the operator to be out of range of the dinker and die when the dinker came down to cut.
 
 
 10
 The evidence presented to the ALJ by the Government consisted of the testimony of the compliance officer who inspected the Burgess plant and photographs of the beam dinker in operation. The compliance officer, after stating his qualifications as an expert in industrial safety, described the manner in which beam dinkers were used at the plant and expressed the opinion that a substantial hazard of mutilating injury to the hands existed. He indicated that the danger could be avoided by replacing the foot pedal currently used to activate the machine with a triggering device requiring both hands to operate. He suggested three ways in which Burgess could avoid the necessity of having the operator hold the die upright under the beam: installation of a bracket on the head of the beam that could hold the die; fabrication of a movable arm device to hold the die; or replacement of dinkers with a "clicker," a machine also used in the industry that did not require use of the hands to hold the die.
 
 
 11
 Robert Burgess, president of the company, William Yarrison, a consulting engineer with design experience in the leather punching area, and Riola Raullinaitis, an employee of Burgess with 13 years experience on the beam dinker, testified on behalf of Burgess. Robert Burgess pointed out that in over 55 years experience with the beam dinker, his company had never had an employee injury resulting in lost time. He asserted that fixing a die to the beam, as suggested by the compliance officer, would be infeasible because continued pounding of the die in exactly the same place would destroy the block underneath the die. He also explained that the "clicker" machine was economically infeasible for his company inasmuch as it could perform only 500 cuts an hour, as compared with the 3500 cuts an hour a skilled beam dinker operator could achieve. He had not considered the use of an arm to hold the die, however, and could not say whether the idea was feasible or not.
 
 
 12
 Yarrison testified that the beam dinker was the most productive means of performing the work taken on by Burgess and that several steps could be taken to increase the operator's safety without requiring removal of his hands from the operating area. In particular he suggested fashioning a rim around the top of the dies so that fingers could not intrude between the beam and the dies. Mrs. Raullinaitis described how she had caught her finger underneath the die, resulting in the only accident on the machine ever reported, and how she thereafter avoided any further risk of repeating the experience by removing her hand from the leather before operating the machine.
 
 
 13
 The ALJ found that the Government had failed to demonstrate anything more than a theoretical hazard. He argued also that "(t)he Secretary carries the burden of proving by a preponderance of the evidence that the hazards to the Dinker operators are preventable." Because the risk was so slight and because the Government had not shown that what risks existed were preventable, no "hazard" existed within the meaning of 29 C.F.R. § 1910.212(a)(1).
 
 
 14
 The Commission reversed, ruling that the ALJ had given too much weight to the fact that no substantial injuries had occurred and had improperly placed the burden of proof on the Government as to the feasibility of preventing the hazard. If the objective facts show the presence of a hazard, the Commission stated, an individual employer's safety record was irrelevant. Furthermore, a showing of noncompliance with a standard made out a prima facie case, and the burden then shifted to the employer to show compliance was impossible.[1] Here, the operation of the machine provided objective evidence of the presence of a hazard to the fingers, and the employer presented no evidence to show it could not reasonably use a flexible arm as a substitute for hand holding of the dies.
 
 
 15
 Burgess first challenges the sufficiency of the evidence here as to the existence of a hazard, citing in particular this court's decision in Cape & Vineyard Div., New Bedford Gas and Edison Light Co. v. OSHRC, 512 F.2d 1148 (1st Cir. 1975). In Cape & Vineyard Div., the employer was charged with a serious violation of a safety standard stated in general terms concerning protective equipment. This court ruled that a regulation without ascertainable standards must be read "to penalize only conduct unacceptable in light of the common understanding and experience of those working in the industry." Id. at 1152. Burgess claims that the standard at issue here must be similarly interpreted, and that the record is bare of evidence that its practice was unacceptable in light of industry practice and understanding. This standard, however, lacks the generality that necessitated the narrowing construction applied in Cape & Vineyard Div. 29 C.F.R. § 1910.212(a)(3)(ii) states specifically that the "point of operation of machines whose point of operation exposes an employee to injury, shall be guarded." The kinds of guarding that can be used are described, and Burgess does not argue that it lacked notice that a two-handed triggering device could bring its dinkers into compliance with the Act. The only question here is whether the dinker's point of operation "exposes an employee to injury," an issue on which the Government introduced substantial evidence through the testimony of its compliance officer. Burgess disputes the qualifications of the officer to testify as an expert on design safety, but in light of his extensive experience as a safety engineer the decision of the Commission to credit his testimony seems reasonable. The officer testified that the dinker exposed its operator to injury of either hand through pinching or cutting. Burgess and Yarrison did not dispute the existence of a risk, only its degree and the means of mitigation. The fact that no substantial injury had occurred in years of use was entitled to great weight, but as this court said in Cape & Vineyard Div., supra at 1150, "while the occurrence of injury may be relevant to proving a violation, it is not conclusive." In sum, substantial evidence that the beam dinker exposed its operator to injury, and therefore violated the Act, existed in the record.
 
 
 16
 Burgess also argues that the Commission's decision was arbitrary and capricious inasmuch as it rejected the ALJ's findings of fact and substituted its own view of the case in spite of its own position that deference should be given to an ALJ's evidentiary rulings. See Secretary v. Oakland Construction Co., OSHRC Docket No. 3395 (Feb. 20, 1976). It is clear from the Commission's opinion, however, that it reversed the ALJ not because it disagreed with his weighing of the evidence, but because it believed he applied the wrong standards as to the evidence required. This court and others have recognized the authority of the Commission to develop its own principles for determining the sufficiency of evidence, which can be used to overrule decisions of an ALJ who applies conflicting rules. See D. Federico Co. v. OSHRC, 558 F.2d 614, 617 (1st Cir. 1977) (Coffin, C. J., concurring); Ace Sheeting & Repair Co. v. OSHRC, 555 F.2d 439 (5th Cir. 1977). See also Bangor and Aroostook Railroad Co. v. ICC, 574 F.2d 1096, at 1110-1111 (1st Cir. 1978).
 
 
 17
 Finally, Burgess argues that compliance with the standard would be infeasible, inasmuch as the operator must hold the die in order to use the beam dinker and the alternative technology, the "clicker," would unacceptably lower Burgess' productivity.[2] But "where a specific duty standard contains the method by which the work hazard is to be abated, the burden of proof is on the employer to demonstrate that the remedy contained in the regulation is infeasible under the particular circumstances." Ace Sheeting & Repair Co., supra at 441. Here Burgess has failed to carry its burden. The Government's evidence indicated that dies might be held in position by a flexible arm, thereby freeing both of the operator's hands for triggering the dinker, and Burgess introduced no evidence rebutting this testimony. We would hope that if, in fact, this alternative is technologically infeasible, see note 2, the Secretary would not preclude Burgess from so demonstrating in any subsequent proceeding, but in this record we can see no basis for overturning the Secretary's decision.
 
 
 18
 The petition for review is denied.
 
 
 
 *
 Judge Crary of the Central District of California was on the panel when this case was heard but died before the final decision was written
 
 
 [1]
 Rather than "impossibility," the question is more properly thought of in terms of feasibility, see footnote 2
 
 
 [2]
 The "feasibility" defense refers to more than technological ability, and applies where increased costs would make the proposed substitute technology impracticable. As the District of Columbia Circuit has observed in a somewhat different context,
 "There can be no question that OSHA represents a decision to require safeguards for the health of employees even if such measures substantially increase production costs. This is not, however, the same thing as saying that Congress intended to require immediate implementation of all protective measures technologically achievable without regard for their economic impact. To the contrary, it would comport with common usage to say that a standard that is prohibitively expensive is not 'feasible'."
 Industrial Union Dept., AFL-CIO v. Hodgson, 162 U.S.App.D.C. 331, 341, 499 F.2d 467, 477 (1974).