**QUALITY STAMPING PRODUCTS,**
**Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; Secretary of Labor; United States Department of Labor, Respondents.**

No. 81–3566.

United States Court of Appeals,
Sixth Circuit.

Argued March 28, 1983.

Decided June 17, 1983.

Douglas B.M. Ehlke (argued) Douglas B.M. Ehlke & Associates, Federal Way, Wash., for petitioner.

Ray Darling, Secretary, O.S.H.R.C., Paul A. Lafranchise, Sr., Allen H. Feldman, Laura V. Fargas/Domenique Kirchner (argued), Office of the Sol., U.S. Dept. of Labor, Washington, D.C., for respondents.

Before JONES and WELLFORD, Circuit Judges, and PORTER, Senior District Judge.*

PER CURIAM.

The Occupational Safety and Health Review Commission (OSHRC) cited petitioner, Quality Stamping Products (Quality), for three [1] violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, and the standards promulgated thereunder. Quality maintained a metal stamp-

---

* The Honorable David S. Porter, Senior District Judge for the Southern District of Ohio, sitting by designation.

1. There were originally four violations charged (two in each citation), but one of the charges in Citation One was dropped.

ing shop in Cleveland, Ohio, and employed approximately 40 employees when the alleged violations occurred in the spring of 1980. The citations occurred after an inspection of Quality's operation by representatives of the Department of Labor. Both citations involved section 5(a)(2) of the Act and standards issued in respect to the Act.[2] In Citation One the Secretary of Labor charged that Quality's failure to use point of operation guards on a metal stamping press was a "serious violation" within the meaning of Section 17(k) of the Act in that "there was substantial probability that death or serious physical harm could result" as a consequence thereof, and that Quality "knew, or with exercise of reasonable diligence could have known of the presence of the violation." [3]

The second citation did not charge a "serious violation" under Section 17(k), but it charged two separate violations, one under 29 C.F.R. § 1910.217(b)(8)(i),[4] and the other under 29 C.F.R. § 1910.217(g).[5] These violations were rather deemed by the Secretary of Labor to be non-serious under 17(c) of the Act. 29 U.S.C. § 666(c). The first citation called for immediate remedy of the violation and a penalty of $630.00. The second for rectification within a specified period.

The issue in this appeal is whether there was substantial evidence to support the OSHRC finding that Quality committed the violations charged by (1) failing to safeguard the point of operation on a particular mechanical power press, (2) failing to provide a lockout capability on the press, and

2. Section 5(a)(2) sets out that employers must "comply with occupational safety and health standards promulgated under this Act."

3. Citation One involved 29 C.F.R. § 1910.-217(c)(1)(i) which provides:
   (c) Safeguarding the point of operation—(1) General Requirements. (i) It shall be the responsibility of the employer to provide and insure the usage of "point of operation guards" or properly applied and adjusted point of operation devices on every operation performed in a mechanical power press.

4. C.F.R. § 1910.217(B)(8)(i) provides:
   (8) Electrical (i) A main power disconnect switch capable of being locked in the Off

(3) failing to report accidents resulting from use of power presses to OSHA.

We will consider the charges in reverse order since we deem Citation Two issues to be comparatively clear cut.

## CITATION TWO

### (CHARGE ONE)

The specifics of charge one are:

Power press control system[s] on mechanical power press[es] were not provided with main power disconnect switch[es] capable of being locked only in the off position:

M–60 Niagara Press # Q1, press room.

The Secretary contends that the standard or regulation, 29 C.F.R. § 1910.217(b)(8)(i), means what it says—that there must be a power disconnect switch capable of being *locked* in the "off" position. Quality, on the other hand, maintains that the electric cord plug furnishing power to the press in question could easily be unplugged or disconnected from the main power source, and that this should be sufficient. There is no real dispute that there was no "lock out" capability in the particular press by means of a "main power disconnect switch," which could be "locked" in an "off" position. Rather, Quality complains that there is no definition of "disconnect" in the standard; that it requires a useless capability, and is therefore unfair, illogical, arbitrary and illegal.

position shall be provided with every power press control system.

5. C.F.R. § 1910.217(g) provides:
   (g) Reports of injuries to employees operating mechanical power presses. (1) The employer shall, within 30 days of the occurrence, report to either the Director of the Office of Standards Developments, OSHA, U.S. Department of Labor, Washington, D.C., 20210, or the State agency administering a plan approved by the Assistant Secretary of Labor for Occupational Safety and Health, all point of operation injuries to operators or other employees.

**1096**

Petitioner cites *H & H Tire Co. v. U.S. Department of Transportation,* 471 F.2d 350 (7th Cir.1972) in support of its position. That case involved a standard imposed upon tire retreaders by the Department of Transportation which required that they meet the same safety test requirements for high speed and endurance as developed originally for new tires. The court found on the record developed in the case that this standard had a "considerable impact on the retreading industry," and was not "technologically and economically feasible." The court, therefore, could not "conclude from the record ... that the respondents adequately investigated the practicability" of the standard involved. *Id.* at 354–55. It should be noted that the *H & H Tire* suit was filed shortly after promulgation of the challenged standard, which affected a substantial segment of an entire industry, and indications were that the Department involved "failed to inquire adequately into certain important topics" before effectuating the standard through "informal rulemaking procedures." *Id.* at 355. Justice Stevens, then a member of that panel, concurred in the decision that the proposed standard had not been given proper consideration as " 'reasonable, practicable and appropriate' before (being) prescribed." *Id.* at 356. The same standard was similarly challenged in *National Tire Dealers & Retread Ass'n v. Brinegar,* 491 F.2d 31 (D.C.Cir. 1974).

■ We do not believe these cases to be persuasive authority on the record involved in the case *sub judice.* Petitioner has made no record indicating that the standard in controversy, 29 C.F.R. § 1910.-217(b)(8)(i), is not technologically and economically feasible, nor that respondent has not adequately investigated the practicability of the standard. There is no evidence to which petitioner points to indicate that this regulation is not "reasonable, practicable and appropriate" to meet desirable safety standards for heavy machinery that can cause serious bodily harm to the operator or others at the point of operation exposure. Petitioner has failed to demonstrate that the standard is not rationally related to the

statute, whose salutary purpose is to provide "so far as possible every working man and woman in the Nation safe and healthful working conditions.... 29 U.S.C. § 651. "The purpose and intent of the Act is to protect the health of the workers." *American Smelting Co. v. O.S.H.R.C.,* 501 F.2d 504, 511 (8th Cir.1974); *See also Brennan v. Southern Contractors Service,* 492 F.2d 498, 499 (5th Cir.1974). In light of the evident purpose of the Act, neither it, nor standards which on their face reasonably effectuate that purpose, should be narrowly interpreted nor should they be set aside as "useless" or "illogical" absent evidence to support that conclusion. We sustain the holding of respondent as to this citation on the record before us.

## CITATION TWO

### (CHARGE TWO)

■ We next consider the charge that Quality failed to report an accident or accidents to OSHA as required by 29 C.F.R. § 1910.217(g). Again, there is no serious dispute that petitioner did in fact fail to report to OSHA a March 4, 1980, accident in which the fingers of power press operator, Melvin Mazza, were crushed and later amputated. A prior accident in the Quality shop on March 20, 1979, was also not reported. Quality contends that since it filed Workmen's Compensation reports with the State of Ohio, and since it maintained records of these accidents, which were voluntarily made available to the Labor Department investigators, the violation should be treated as *de minimis,* particularly since the Secretary admitted that it had previously treated other such matters as *de minimis.* Essentially, petitioner argues that the Ohio Workmen's Compensation agency is an approved OSHA data collection course, and filing an accident report with the state agency should be deemed compliance or substantial compliance with OSHA requirements. We agree with Commission Judge Sparks, however, that "under the facts of this case, a violation 'other than serious' classification, without penalty, is appropri-

ate." It was not demonstrated by petitioner that the Ohio Workmen's Compensation agency was administering a plan approved by the Department of Labor or OSHA. The respondent should be affirmed on both charges in Citation Two.

## CITATION ONE

■ There is little dispute that the underlying basis for Citation One was a March 4, 1980, accident in which the fingers of employee Melvin Mazza were crushed during a die adjustment procedure on a Niagara M–60 press.[6] Throughout the hearing before the Commission Judge, Quality objected to introduction of evidence pertaining to this accident. Quality's position was that the accident occurred not during normal operation of the press but during a die adjustment or maintenance mode. Since 29 C.F.R. § 1910.217(c)(1)(i), the regulation allegedly violated, only applies to normal power press operating modes and not to die adjustment or maintenance, Quality claimed the evidence was irrelevant. Quality also noted that respondent's complaint never mentioned March 4, 1980, as the date of the alleged violation.[7] These objections were overruled by the Commission Judge after hearing the evidence in the case.

The Commission Judge did not admit evidence of the accident as proof of a violation of § 1910.217(c)(1)(i). The evidence was considered for the limited purpose of showing the gravity of the violation. The Mazza evidence indicated that if an accident did occur during the operational mode, the resulting injury could be serious. The administrative official further concluded that Quality, under all the circumstances, was not prejudiced by the "considerable amount of confusion or disagreement between the compliance officers and Area Director as to the violations . . . [and] several discrepan-

cies in times and dates in worksheets prepared by the compliance officers during the inspection and the dates referred to in the complaint." *See* n. 7 *supra*. He also held that the citations themselves clearly set out the dates of alleged violations—for Citation One, "on or about March 4, 1980," for Citation Two, "on or about the date the inspection was made." He noted that Quality had full opportunity for discovery prior to the hearing "to determine with precision the exact basis of complainant's allegations." We agree with the reasons given for that conclusion on the record in this case. Neither the ruling to admit the evidence about the March 4, 1980 accident, nor the decision to consider that evidence for the limited purpose of showing potential gravity was clearly erroneous.

In the M–60 press operation for which the citation was issued, a large roll of metal stock is manually fed in a continuous manner by the operator from outside the press frame through fixed guides on the outermost edge of the press. The operator's left hand remains on the separate coil stock roll to feed the roll into the press while the right hand remains outside the right press frame exit guide to hold the stock down and pull it from the die area. The operator is instructed to hold his hands about 40 inches apart completely outside the recessed die area and outside the entire press frame at all times. There are metal guide posts and tunnels for the metal coil stock on the outer edges of the M–60 press frame, but there are no point of operation guards. The press is activated by a metal shroud guarded foot pedal.

From time to time the machine operation produced slugs which lodged in the overhead die and caused the press to jam. When the operator perceived this condition, he had available a tool or air hose to remove

---

6. Respondent does not deny that OSHA representatives had previously inspected petitioner's M–60 press without noting any objection or exception to its use without point of operation guards. Quality was never cited previously for any such violation, although it had operated this press in the same fashion for many years. There were no other injuries suffered in Quality's shop as a consequence of this operation of

the press for some thirty years prior to the Mazza accident.

7. The complaint (part IV) refers to Citation One and that "on or about April 28 to May 6, 1980" petitioner violated the Act and standards involved.

the slugs without reaching his hands into the press area. The M–60 press also was equipped for two-hand button controls, pull-back straps, and an inching mechanism to keep hands away from the point of operation and barrier guards, but Quality did not consider use of these safety devices to be practicable during this operation. As found by the hearing judge, it is undisputed that there was no barrier or point of operation guard on the M–60 press on March 4, 1980.

The hearing official determined that during normal operations "there was no guard which physically prevented the employee's hands from entering the press." He also found that during normal operations "pull backs or safeties were not used," and that "parts of the body would be between 6 and 12 inches from the ram, and the operators hands about 12 inches from the nip points." [8] Quality contended that use of a barrier guard was not feasible during its normal operations since it would interfere with observation of and removal of slugs, and would even create a hazard by deflecting slugs toward the operator. Furthermore, barrier guards could not be used during die adjustment. Quality further argued that respondent failed to establish that barrier guarding at the point of operation of the press was feasible or economically practicable. The respondent held, in support of the Commission Judge, that "the burden is not on the Secretary to prove that guarding of the cited machine is feasible, rather, the burden is upon the employer to show that compliance was impossible," citing *Consolidated Aluminum Corp.*, 80 OSHRC 125/A2, 6 BNA OSHC 2139, 1981, CCH OSHD § 25,069 (Docket No. 77–1091, 1980), and *E.H. Lawson Co.*, 80 OSHRC 19/A14, 8 BNA OSHC 1528, 1980 CCH OSHD § 24,277 (Docket No. 12883, 1980).

Was the burden properly placed on Quality to show that compliance would preclude performance of required work, or that alternate means of employee protection were available, or that performance under the standard here involved was impossible? In considering this question, we first turn to a decision of this Court which discussed 29 C.F.R. § 1910.217(c). *Diebold, Inc. v. Marshall*, 585 F.2d 1327 (6th Cir.1978), dealt with the sufficiency and practicality of barrier guards on Diebold press brakes rather than with power presses. The decision turned on an interpretation of 29 C.F.R. § 1910.212, which prescribes general machine guarding requirements, but the relationship between §§ 1910.212 and 1910.217 was discussed, and the nature and character of both these standards were at issue. In this discussion, the court stated:

In the same package of "interim standards" with which the Secretary adopted the general machine guarding requirements from the Walsh-Healey Act regulations, he also promulgated guarding requirements specifically applicable to mechanical power presses. 36 Fed.Reg. 10466, 10643 (May 29, 1971), codified at 29 C.F.R. § 1910.217. These requirements were drawn from a "national consensus" source standard originally issued by the American National Standards Institute (hereinafter "ANSI"). *Section 1910.217 sets out both a general rule that power press points of operation be guarded and a detailed specification of the acceptable means for achieving that end.* 29 C.F.R. § 1910.217(c). (emphasis added).

585 F.2d at 1223.

■ The 29 C.F.R. § 1910.217 standard, then, is a general rule, but it includes a

**8.** The proof with respect to the method of operation on March 4, 1980, did not come from OSHA witnesses, because none of them were in the Quality shop on that day. On April 28, 1980, the inspectors or compliance officers came to the plant where they interviewed employees and took statements about the Mazza accident. All of the citation charges, including Citation One came from these interviews, and from brief observations at the Quality shop between April 18 and May 6, 1980. At the hearing, however, Mazza and the Quality President, among others, testified about the method of operation on the M–60 press during the morning before the accident. There was evidence, then, in the record to support the findings that employees were exposed to a hazard during normal operations, that the pull-back safety device was not used, and that there were no "point-of-operation guards" during the operation performed on the mechanical power press. The evidence supported the conclusion that petitioner had not adhered to the requirements of 29 C.F.R. § 1910.27(c)(1)(i).

specification of acceptable means for achieving the end of safeguarding the point of operation of a power press. Quality argues that under *Diebold* the Secretary has the burden of specifying "technologically feasible means of compliance." *Diebold,* 585 F.2d at 1333. That burden, however, is imposed only where the standard in question "imposes a duty without specifying the means of compliance." *Id.* at 1333. As pointed out in *Diebold:*

> Of course, where the regulation itself specifies the means for compliance, the burden rests on the employer to show the technological impossibility of the specified means. *See, e.g., A.E. Burgess Leather Co. v. OSHRC,* 576 F.2d 948, 952 (1st Cir.1978); *Ace Sheeting, supra; Brennan v. OSHRC (Underhill Const. Corp.),* 513 F.2d 1032, 1035 (2d Cir.1975). *See also I.T.O. Corp. of New England v. OSHRC,* 540 F.2d 543, 546 (1st Cir.1976) (burden relative to economic nonfeasibility rests on the employer); *Arkansas-Best Freight Systems, Inc. v. OSHRC,* 529 F.2d 649, 654 (8th Cir.1976) (same).

585 F.2d at 1333, n. 8.

This placement of the burden of proof is also consistent with the holding in *Central of Georgia Railroad v. OSHRC,* 576 F.2d 620, 624 (5th Cir.1978), where the court observed:

> We regard the Commission's position at least in part as an allocation of burdens of proof. Under this allocation the Secretary must first make out a prima facie case; the burden then shifts to the employer to rebut this prima facie case; or if he does not do so, he may establish an affirmative defense by showing his own lack of control over the hazard, and—according to the Commission—his protection of the employees through alternative measures. For reasons discussed below, we need not consider the Commission's "alternative measures" requirement in the context of this case. Aside from this point, however, we think that the Com-

mission's allocation of burdens is appropriate.

The Fifth Circuit explained that a prima facie case entails:

> a showing that (1) a specific standard applied; (2) there was a failure to comply with a standard; and (3) the cited employer's employees had access to the hazard.

576 F.2d at 624, n. 2.

In the instant case, respondent showed that the standard involved, 29 C.F.R. § 1910.217(c)(1)(i), is a specific standard,[9] that Quality failed to comply with it, and that Quality's employees were exposed to the resulting hazard. Thus, it was proper under these circumstances, to impose upon Quality the burden of establishing non-feasibility or impossibility of compliance, or alternate means of protection of the worker involved. We make clear, however, that where only a general standard is involved without suggested or specified means of compliance, the burden is placed upon the Secretary to establish a technological and feasible means of compliance. *Diebold,* 585 F.2d at 1333. *See also Burgess Leather Co. v. O.S.H.R.C.,* 576 F.2d 948, 952 (1st Cir.1978); *Ace Sheeting & Repair Co. v. O.S.H.R.C.,* 555 F.2d 439, 441 (5th Cir.1977). "A standard that is prohibitively expensive is not 'feasible.'" *AFL–CIO v. Hodgson,* 499 F.2d 467, 477 (D.C.Cir.1974).

We affirm the conclusion reached in this case that Quality did not meet its burden after the prima facie showing of noncompliance under Citation One. We would join in the observation of hope made in *Burgess Leather Co.,* 576 F.2d at 952, that "if, in fact, any alternative [means of compliance under the standard in question] is technologically impossible, the Secretary would not preclude the employer from so demonstrating in any subsequent proceeding."

Finally, we conclude that the Commission Judge made sufficiently specific findings on the record, including resolution

**9.** *Irvington Moore v. OSHRC,* 556 F.2d 431, 433 (9th Cir.1977), also describes 29 C.F.R. § 1910.-217 as setting forth a "number of *detailed* safe-

ty standards for point of operation" guarding. (Emphasis added).

of credibility, to warrant the conclusion that Quality was in violation of the standards as charged and that a penalty of $630.00 was appropriate as to Citation One.

Accordingly, the decision of OSHRC is AFFIRMED.