**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John Philip KWITEK, Defendant-Appellant.**

**No. 71-1510.**

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1972.

Decided Sept. 7, 1972.

Certiorari Denied Dec. 18, 1972. See 93 S.Ct. 702.

David J. Hase, Milwaukee, Wis., for defendant-appellant; Cook & Franke S. C., Milwaukee, Wis., of counsel.

David J. Cannon, U. S. Atty., Joseph P. Stadtmueller and Richard P. Broder, Asst. U. S. Attys., Milwaukee, Wis., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, PELL, Circuit Judge, and DURFEE, Senior Judge.*

KNOCH, Senior Circuit Judge.

Defendant-appellant, John Philip Kwitek, has taken this appeal from his conviction in a jury trial on an indictment charging him with armed robbery of a bank in Greenfield, Wisconsin, in violation of Title 18, U.S.C. § 2113(a) and (d).

While awaiting trial on an earlier indictment charging the same offense, appellant escaped. Within a month of his recapture, he changed his prior plea of "not guilty" to "guilty." When a co-defendant's motion to vacate sentence imposed on him was granted on the ground that the indictment was defective in failing to allege that the bank was fed-

erally insured, this appellant's sentence was also vacated.

Another indictment was returned, and appellant was tried by a jury which brought in a verdict of guilty, but a mistrial was declared on motion of appellant when it became apparent that a summary of appellant's prior criminal record had been sent into the jury room by mistake.

A second trial also resulted in a verdict of guilty which was set aside on appeal on the ground that illegally seized evidence had been admitted. United States v. Kwitek, 7 Cir., 1970, 433 F.2d 18. It is from the verdict in the third trial that this appeal has been taken.

Appellant urges this Court to review the sufficiency of the evidence at his first trial despite the fact that a mistrial was declared on his own motion. Prior to the second trial, the Court denied appellant's renewed motion for judgment of acquittal. It is appellant's position that his second and third trials were barred by the double jeopardy clause of the Fifth Amendment.

In effect this theory was also presented in the prior appeal and decided adversely to appellant, 433 F.2d 19. We do not agree that United States v. Jorn, 1971, 400 U.S. 470, 91 S.Ct. 547, 27 L. Ed.2d 543, on which appellant relies, dictates a change in our view that the proceedings at the first trial became nugatory and without legal effect. In *Jorn*, there was not only no motion for mistrial by the defendant there, but the Trial Judge was held to have abused his discretion in granting mistrial without exploring other suitable alternatives. 400 U.S. 485–486, 91 S.Ct. 547. Even had no defense motion been made, under the circumstances of this case, we do not believe that an abuse of discretion could have been found. Before declaring a mistrial, the Court ascertained that the jury in fact did know the content of the document inadvertently sent in to them and had considered it in their deliberations.

* Senior Judge James R. Durfee of the United States Court of Claims is sitting by designation.

Appellant contends that the evidence at the third trial was also insufficient as a matter of law to sustain conviction. He argues that he was never drawn within the web of the government's circumstantial proof, and that the evidence was reasonably susceptible to hypotheses consistent with his innocence, at worst showing him only a possible receiver of the proceeds of the bank robbery.

He asserts that no more than four persons were shown to have been in the bank, although five were indicted. Considering the evidence at both trials, it is apparent that no more than four persons were seen at any one time, but there was evidence from which the jury must have concluded at the third trial that five robbers were involved. At neither trial did Mrs. Diane Rapp, the Assistant Cashier, refer to seeing more than four men, but at the third trial, it became apparent that she was aware of five robbers. She described being struck on the head by someone immediately behind her, whom she did not see, while at the same time, there were three men in front of her in her field of vision, and, simultaneously, she heard the voice of a fourth man off in the distance, from the doorway of the stairs going down to the basement of the bank. There was no real discrepancy in her testimony at the trials. She explained in cross-examination, that she was never asked before, "How many were there?" but only how many she had seen. Counsel for the defense read at the third trial segments of the transcript of prior trials which Mrs. Rapp acknowledged as her testimony. These supported her present assertion that she had said at one point:

Saw three and heard the voice of a fourth at the time I was slapped in the head from behind, yes.

The bank's Vice-President, Theodore T. Buckley, who at the outset attempted to block the entry of the robbers, was overpowered and brought back into the bookkeeping area where he was knocked to the ground, then dragged to two different areas behind the tellers' cages,

and finally, with other bank employees, to a small conference room. Later when the robbers left, he and his assistant, who testified at the first trial, ran to their desks to sound the alarm and to call for help. Both looked through the windows and saw the robbers leaving by automobile. Both described the automobile in detail. They saw only four men in the car. The fact that Mr. Buckley had seen only four men in the bank at various times from his different positions of observation did not require the jury to discredit Mrs. Rapp's testimony. Mr. Buckley when asked on cross-examination whether he had not earlier that same day testified that when he observed the automobile driving away, it had all the robbers in it, corrected counsel, noting that he had seen it drive away, but as to how many men were in it, he did not know. He saw four. When asked how many individuals he personally observed participating in the robbery, he said he observed no more than four.

At the first trial, the assistant to Vice President Buckley had testified that all he could see were heads in the get-away car, and that it was his best estimate that there were four. In the bank itself, he had seen only two.

A witness who lived in a cottage behind the building in which the mother of co-defendant Harold Timm resided, testified that in the afternoon of a day in July, 1967, she saw four individuals in makeup and false beards in the yard and a fifth bearded individual in a car in the alley.

As appellant notes, no witness could identify him in open court as one of the participants. All the robbers were disguised in heavy clown makeup and crepe hair beards. Mr. Buckley was able only to say that appellant's hair line and build were similar to that of one of the robbers. He did identify a 1959 Ford automobile with a large rust spot on the trunk as the automobile in which the robbers drove up to the bank. This automobile belonged to appellant's brother, co-defendant David Kwitek.

Appellant also points out that he has a pronounced speech impediment, and none of the robbers was heard to stutter. However no witness testified to hearing each of the robbers speak. Appellant also notes that although one of his co-defendants had some of the "bait" money in his possession when arrested, appellant himself had none.

He argues that no witness placed him in the vicinity of the crime and he disputes the value of evidence as to his possession of money after the robbery because he says there was no proof he had been impecunious before, although when arrested he did admit having been unemployed for three months. He complains further that evidence of his activities and expenditures after the time of the robbery, including possible violation of the Mann Act, was not only irrelevant but prejudicial. It is his view, also, that his false statements denying travel to Las Vegas with other persons besides his brother and another co-defendant, Harold Timm, and his disclaimer of having seen Donald Crisp, also a co-defendant, during the two months prior to his arrest, cannot be considered evidence of a consciousness of guilt. This issue was also presented and disposed of adversely in the prior appeal, 433 F.2d 20. By his statements, appellant was denying the presence on his travels of two witnesses who ultimately gave damaging evidence against him. See also United States v. Crisp, 7 Cir., 1970, 435 F.2d 354, 359–360, cert. den. 402 U.S. 947, 91 S.Ct. 1640, 29 L. Ed.2d 116, and cases there cited. Expensive trips, gambling and other instances of free spending and high living may be pertinent in crimes involving a motive of enrichment. Proof of prior impecunity is not necessary. Admission of this type of evidence is addressed primarily to the sound discretion of the Trial Judge. We find no abuse of discretion here.

Appellant also asserts that the jury's deliberations were contaminated when the forelady of the jury was allowed to see him in the "bullpen" of the marshal's office, when, in company of a deputy marshal, she brought some exhibits in for safekeeping at the close of the day's deliberations.

The forelady testified at an evidentiary hearing on appellant's supplemental motion for a new trial, that, when she saw appellant, he was standing in the enclosure wearing a business suit, that she saw no shackles or handcuffs, nor was he apparently under lock and key, and that she did not believe at the time that appellant was imprisoned.

In addition to the evidence noted above, there were numerous incidents and circumstances from which the jury could reasonably have concluded that five robbers were involved and that appellant was one of these. On the evening of the robbery, all five co-defendants visited a night club in Chicago at which co-defendant Harold Timm, gave a dancer, Miss Cathy Fletcher, a $50 tip. She and another dancer, Mrs. Rosetta Hoover, agreed to meet the men, whom they had not previously known, at a restaurant later, where appellant told Mrs. Hoover that he had come to Chicago from Milwaukee, Wisconsin, that evening. He gave her $70 to buy clothing for a trip to Las Vegas, Nevada, and paid cash for her air fare there when the five men and the two girls departed from O'Hare Airport where tickets were bought for all at a cost of about $200 each.

In Las Vegas, they rented motel rooms and automobiles and gambled. Mrs. Hoover testified that appellant gave her about $50 with which to gamble. Both girls identified a photograph of themselves, appellant, and Harold Timm, taken on the night of July 27th at a night club in Las Vegas. The next day, appellant gave Mrs. Hoover $150 with which to gamble.

Miss Fletcher testified to seeing a suitcase containing a firearm and stacks of $20 and $50 bills in one of the rooms, after which they both returned to Chicago. While they were in Las Vegas, Mrs. Hoover had seen appellant with large sums of cash, which Mrs. Hoover said ran as high as $500.

Mrs. Hoover met the appellant on his return from Las Vegas in Chicago. She said he bought a diamond ring and wedding band and asked her to divorce her husband and marry him.

Shortly afterward, Mrs. Hoover, appellant, his brother David, Harold Timm, another woman and her daughter, all drove to Northern Wisconsin. One of the automobiles used in the trip was David Kwitek's car which fitted the description given by the witnesses in the bank. When 'they all drove back together, it was in the other car used. David Kwitek's car was abandoned in Northern Wisconsin.

While they were in Northern Wisconsin, Mrs. Hoover saw a suitcase full of stacks of $20 bills bound by paper bands in the bedroom area which she and appellant were using. She also saw a German Mauser firearm in a holster in appellant's possession. She stated that appellant urged her to go to Mexico with him, saying he had enough money to take care of her for the rest of her life.

Several days after their return to Chicago, Mrs. Hoover, appellant, his brother David and Harold Timm did drive to Juarez, Mexico. She identified another picture of the four of them at a night club in Mexico. She also saw the same German Mauser again. Appellant told her there might be some trouble with the F.B.I. and that there might be some shooting. They all drove to El Paso, Texas, from where she flew back to Chicago, appellant having purchased her fare and paid for her hotel room in El Paso.

When appellant, his brother and Harold Timm were arrested at the Rokeby Arms Hotel in Chicago, appellant stated that he alone with his brother and Harold Timm had made the trips to Las Vegas and to Juarez and that nobody else was with them. He said they had picked the hotel at random when just riding around. Mrs. Hoover testified that appellant asked her to make reservations there for him, his brother and Mr. Timm when she left El Paso.

It is apparent from this brief sampling of the evidence that issues of fact and credibility were presented for the jury's determination. This Court must, of course, sustain their verdict if there is substantial evidence to support it, viewing the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the government. United States v. Roustio, 7 Cir., 1972, 455 F.2d 366. As Senior Judge Hastings, speaking for the Court, said in that case, quoting from Holland v. United States, 1954, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150, in dealing with circumstantial evidence, a jury must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of inaccurate or ambiguous inference, and if the jury is convinced beyond a reasonable doubt, we may not require more.

After consideration of the appellant's arguments and scrutiny of the authorities cited, we are left with the conclusion that the judgment of the District Court must be affirmed.

Affirmed.