■ We offer the following suggestions to the bankruptcy court:

1) In light of our disposition of the case and the opinion of the district court and this court that the Missouri authorities have proceeded in good faith, the bankruptcy court should consider dismissal of the contempt proceedings.

2) To adequately protect holders of warehouse receipts, particularly Missouri farmers, the bankruptcy court and the trustee may wish to consider the advice of James Boillot, Acting Director of Agriculture for the State of Missouri, either as a party or a proxy or as amicus curiae.

3) The trustee and the bankruptcy court should take steps to expedite the determination of ownership of the Missouri grain, including possible appointment of special masters. *See* Rules of Bankruptcy Procedure 513.

We have by separate order this date dismissed and discharged any and all stays of proceedings in this action.

Writ denied in No. 80–2198; appeal affirmed in No. 80–2179.

UNITED STATES of America, Appellee,

v.

**Frank DEAN, Appellant.**

**No. 79–1919.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1980.

Decided April 17, 1981.

Rehearing En Banc Granted
June 11, 1981.

Steven H. Goldberg, UALR School of Law, Little Rock, Ark., Fred M. Pickens, Jr., Newport, Ark. (argued), and Timothy F. Watson, Newport, Ark., for appellant.

George W. Proctor, U. S. Atty., Kenneth F. Stoll (argued), Sherry P. Bartley, Robert J. Govar, Asst. U. S. Attys., Little Rock, Ark., for appellee.

Before LAY, Chief Judge, and BRIGHT and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Appellant Frank Dean appeals from a judgment of the District Court for the Eastern District of Arkansas sentencing him to three years imprisonment and a term of probation, after appellant was convicted by a jury of two counts of violating the Racketeer Influenced and Corrupt Organizations Act (hereinafter RICO), 18 U.S.C. §§ 1962(c), 1963, and with thirty-six counts of violating the Travel Act, 18 U.S.C. §§ 1952, 2. After the jury verdict, appellant brought to the attention of the court evidence that one of the jurors had not been impartial. The district court ordered a new trial. *United States v. Dean,* Nos. J–CR–79–1 and J–CR–79–10 (E.D.Ark. Sept. 26, 1979) (*Dean I*). Subsequently, however, the government obtained evidence that during the trial appellant had heard of rumors that the juror was not impartial. The district court, finding that appellant in the exercise of due diligence should have brought the matter to the attention of the court before the jury retired, vacated its order for a new trial and reinstated the verdict. *United States v. Dean,* Nos. J–CR–79–1 and J–CR–79–10 (E.D.Ark. Oct. 11, 1979).[1] Sentence was then imposed. Appellant contends that the conviction violated his right to trial by an impartial jury.[2] We reverse and remand for a new trial.

This prosecution arose out of bribes allegedly received by appellant in violation of Arkansas law during the years 1971 through 1978,[3] while he was county judge of Poinsett County, Arkansas. (The office of county judge held by appellant was not judicial but rather an executive position similar to that of a county supervisor or manager.) The alleged bribery, which was part of appellant's dealings through the mail with out-of-state vendors, involved both the taking of "kickbacks" on supplies actually delivered to the county and the filing of "bogus invoices" for supplies never delivered, and allegedly cost the county more than $150,000. A grand jury returned two indictments against appellant. One in-

---

1. The court ordered a new trial on Sept. 26, 1979 (*Dean I*); the hearing on the government's motion to vacate the new trial order took place on Oct. 10, 1980. The court on Oct. 11, 1980, issued an order vacating the new trial order; the Oct. 11 order was issued without opinion, and referred to the Oct. 10 proceeding. Subsequently, the transcript of the Oct. 10 proceeding was lost. The parties could not agree on a statement of the proceeding, and the district court on May 8, 1980, issued an order providing a transcription of the court's own notes of the Oct. 10 proceeding as part of the record on appeal in this case. *United States v. Dean,* Nos. J–CR–79–1 and J–CR–79–10 (E.D. Ark. May 8, 1980) (*Dean II*). *See* Fed.R.App.P. 10(c).

2. Appellant also contends that the indictments failed to charge an offense under RICO, that conviction on both RICO counts would violate double jeopardy, and that the district court committed various errors in the conduct of the trial and admission of evidence. We address the contentions as to the indictment in deciding whether to remand the RICO counts, but we do not decide the remainder of the issues, although in the interests of judicial economy we discuss briefly a few questions that are likely to arise on remand.

3. During the period in question Arkansas revised its criminal code and in doing so broadened its bribery statute. *See* Ark.Stat.Ann. § 41–2703 comment (1977). Before enactment of the criminal code the relevant statute was former Ark.Stat.Ann. § 41–901 (repealed Jan. 1, 1976); in the new code the relevant statute is Ark.Stat.Ann. § 41–2703 (1977). Although violations of two technically different Arkansas statutes were alleged in the indictment depending on the date of the alleged specific act of bribery, we consider all the charges to involve the single Arkansas offense of acceptance of bribes by a public officer.

dictment, No. J–CR–79–1, involved appellant's transactions with Paul A. Baldwin, doing business as the Lisco Company. It charged appellant with twenty-nine counts of violating the Travel Act, 18 U.S.C. § 1952,[4] by involvement in use of interstate commerce (the mails) for an unlawful activity (bribery), and one count of violation of RICO, 18 U.S.C. §§ 1962(c), 1963.[5] RICO makes it a federal crime to conduct the affairs of an enterprise[6] affecting commerce (here the county judge's office) through a pattern of racketeering activity[7] (here the alleged bribery[8] and Travel Act violations). The other indictment, No. J–CR–79–10, involved appellant's transactions with Irvin R. Pratt, who represented both Prattco Products Company, Inc., and Bi-Search Industries. It charged seven Travel Act violations based on alleged bribes and one count of RICO based on conduct of the county judge's office through the alleged bribes from Pratt as a pattern of racketeering activity. (Pratt and Baldwin both testified against appellant after they were granted immunity from prosecution.)

*Biased Juror*

The district court found that one of the jurors who reached the verdict convicting appellant had "a settled disposition . . . to convict [appellant] regardless of the evidence." *Dean I, supra*, slip op. at 6. This finding is not challenged on appeal, and there was evidence that the juror in question had made numerous statements demonstrating bias, for example, proclaiming on the first day of trial, "Well, I don't know whether he's guilty or not, but he's not going to get out." *Id.*, slip op. at 1.

Appellant first brought the misconduct to the attention of the district court after his conviction, and the court ordered a new trial. "Bias of this kind in any trier of fact, judge or jury, is inconsistent with the constitutional guarantee of a fair trial. 'Clear . . . bias of a juror is . . . ground for a new trial . . . .' " *Dean I, supra*, slip op. at 3, *citing* 6A Moore, Federal Practice ¶ 59.08(4), at 59–124 (2d ed. 1979).

■ The government then investigated the matter further and learned that an anonymous note had been given to defendant's attorney during the trial. The note related "rumors" that the juror in question had expressed a biased view of the case to a third party. On the government's motion for reconsideration of the new trial motion, the district court found that appellant's attorney had received the note during the trial and had shown the note to appellant. *Dean II, supra*, slip op. app. at 4–5. The

---

**4.** The Travel Act provides in relevant part:

   (a) Whoever travels in interstate . . . commerce or uses any facility in interstate . . . commerce . . . with intent to—

   . . . . . . .

   (3) . . . carry on . . . any unlawful activity, . . . shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

   (b) As used in this section, "unlawful activity" means . . . bribery . . . in violation of the laws of the State in which committed. . . .

18 U.S.C. § 1952.

**5.** RICO provides in relevant part:

   It shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate in . . . such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).

   Whoever violates any provision of section 1962 of this chapter [18 U.S.C. § 1962] shall

be fined not more than $25,000 or imprisoned not more than twenty years, or both . . . .
18 U.S.C. § 1963.

**6.** The statute provides:

   "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

18 U.S.C. § 1961(4).

**7.** The statute provides in relevant part:

   "[r]acketeering activity" means (A) any act . . . involving . . . bribery . . ., which is chargeable under State law and punishable by imprisonment for more than one year . . .,

18 U.S.C. § 1961(1).

   "pattern of racketeering activity" requires at least two acts of racketeering activity, . . .

18 U.S.C. § 1961(5).

**8.** The bribery was allegedly in violation of Ark. Stat.Ann. § 41–2703 (1977) and former Ark. Stat.Ann. § 41–901 (repealed Jan. 1, 1976), both of which were punishable by imprisonment for more than one year.

district court also found that appellant's attorney "in the exercise of reasonable diligence, should have brought the allegation of misconduct on the part of this juror to the [c]ourt's attention," *id.*, slip op. app. at 5, at the time the allegation became known to him.[9] Accordingly, concluded the court, principles of equity would preclude appellant from raising the juror's bias as grounds for a new trial. *Id.* In a later proceeding the court expressed the view that in light of the information received by appellant and counsel during the trial, appellant received a fair trial under the totality of the circumstances.[10]

Although we recognize the importance of the factors leading the district court to vacate its order for a new trial, we think that in the extraordinary circumstances of this case the order for a new trial must be reinstated as an exercise of our supervisory power over the administration of justice in this circuit. Even a serious potential for juror bias has caused the Supreme Court to order a new trial as a matter of the administration of justice. *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam) (exposure of jurors to prejudicial publicity). In this case we are confronted with actual, not potential, juror bias. We cannot permit actual, proven bias which prevents a juror from impartially deciding the case, without doing incalculable harm to the jury system as an institution. "The truth pronounced by Justinian more than a thousand years ago that, 'Impartiality is the life of justice,' is just as valid today as it was then." *United States v. Brown*, 539 F.2d 467, 469 (5th Cir. 1976). *See also Groppi v. Wisconsin*, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971). The actual bias in this case goes to

the heart of the integrity of the judicial proceeding.

We have no disagreement whatsoever with the district court's view that the failure of appellant's attorney to bring the matter earlier to the court's attention resulted from an unjustified lack of diligence. But the remedy cannot be to overlook the fact that this trial did not occur before an impartial jury. The way to address counsel's unjustified delay in raising the question of juror bias is to proceed against counsel in an appropriate forum.[11]

Our belief that considerations of judicial administration are paramount in this case is reinforced by the paucity of reported cases on actual juror partiality in the federal court system. This lack of precedent in the appellate courts reflects the high value traditionally placed upon preserving the integrity of the trial process consistent with the unqualified sixth amendment guarantee of an impartial jury. The vast majority of cases where a juror was actually biased against the defendant have surely been resolved by an order for a new trial, which cannot ordinarily be appealed. The government cites decisions of appellate courts upholding denial of a new trial in cases of juror misconduct with a potential for affecting impartiality, but not cases in which a juror was actually biased. *See United States v. Sorenson*, 611 F.2d 701 (8th Cir. 1979) (per curiam) (allegations that juror slept during part of the trial); *United States v. Nance*, 502 F.2d 615 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975) (allegations that jurors discussed case during trial); *United States v. Hester*, 489 F.2d 48 (8th Cir. 1973) (per curiam) (sleeping juror); *Wangrow v. United States*, 399 F.2d 106 (8th Cir.), *cert.*

---

**9.** Appellant neither brought the matter to the attention of the court when he first heard the rumors, nor told the court of the rumors at the hearing on his motion for a new trial. The district court focussed on the earlier omission in vacating its order for a new trial. We observe that the later omission, while not directly relevant to the merits of the new trial motion, was not explained by appellant's attorney and appears to us an inexcusable failure to provide the court relevant evidence in appellant's pos-

session, a failure that we condemn in the strongest terms.

**10.** On July 1, 1980, the district court held a hearing on appellant's motion to amend the court's statement in *Dean II* of the proceeding in which the court reinstated the verdict. *See* note 1 *supra.*

**11.** *See also* note 9 *supra.*

*denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968) (juror seen reading newspaper during trial); *United States v. Kansas City,* 157 F.2d 459 (8th Cir. 1946) (improper jury view of property involved in civil case); *Langer v. United States,* 76 F.2d 817 (8th Cir. 1935) (jurors reading newspapers during trial); *see also United States v. Brumbaugh,* 471 F.2d 1128, 1130–31 (6th Cir.) (McCree, J., concurring), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed. 144 (1973) (improper remarks to jury by bailiff); *United States v. Carter,* 433 F.2d 874 (10th Cir. 1970) (sleeping juror); *Mares v. United States,* 383 F.2d 805 (10th Cir. 1967) (pretrial publicity); *United States v. Coduto,* 284 F.2d 464 (7th Cir. 1960), *cert. denied,* 365 U.S. 881, 81 S.Ct. 1027, 6 L.Ed.2d 192 (1961) (*simil*). *See generally* 5 L. Orfield, Criminal Procedure Under the Federal Rules § 33.10 (1967); Orfield, *Trial Jurors in Federal Criminal Cases,* 29 F.R.D. 43 (1963). *Cf. Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), *after remand,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (jury tampering efforts are always presumptively prejudicial).

We have found two precedents in the federal system that reinforce the conclusion that a new trial is required in this case.[12] In *United States v. Rattenni,* 480 F.2d 195 (2d Cir. 1973), the court found that a juror, influenced by adverse publicity about Rattenni during the trial, was in fact no longer able to view the case impartially. Holding such a finding grounds for overturning Rattenni's conviction, Justice Clark (sitting by designation) explained,

> Nor can we, as the Government requests, permit the judgment to stand because of the alleged dereliction of Rattenni's counsel. He stated without contradiction that he did not know about any of the publicity until the . . . jurors revealed it. However, he had been told afterwards in the courtroom corridor that 'for the last two days' the [local] media had

'been talking about Mr. Rattenni's prior convictions and indictments. . . .' Counsel's concern over the effect of [a newspaper] article was characterized as 'a little late.' The trial judge found: 'We duly recorded a proper verdict . . . the jury was polled. There was no taint whatsoever on the verdict and I am not going to have any proceeding now in a backhanded way designated to impeach that verdict in this manner. This is not the way to do it.'

*Id.* at 197. Thus, "the crucial importance of protecting the integrity of the trial process," *id.* at 198, controlled the outcome, despite the possibility that the defendant's counsel had failed to bring the issue to the court's attention at the earliest moment.

The only other case we have found involving similar problems of juror bias not raised until after the verdict is an old one, *United States v. Fries,* 9 Fed.Cas. p. 826 (C.C.D.Pa.1799) (No. 5,126), a treason case arising out of Fries' part in organized resistance to measures of the administration of John Adams, including the Alien and Sedition Acts. After Fries' first treason trial resulted in a conviction, the court ordered a new trial on a finding that one of the jurors had been prejudiced. *Id.* at 921–23. The juror had revealed prejudice by saying that the defendant "ought to be hung." *Id.* at 918. The verdict convicting Fries had been reached May 9, 1799, yet counsel did not raise the issue of juror bias to the court until May 14, despite counsel's admission on May 14 that "the other day, in coming into court, he received a slight information, which he thought it his duty, as advocate for the prisoner, to make further inquiries into; but it was not till this morning that he had been able to procure the depositions of witnesses to prove a fact . . . ." *Id.* at 916. Thus, like counsel in the present case, Fries' counsel had information prior to the verdict which he did not bring to the attention of the court until after the

12. There is also dicta in *Gomez v. United States,* 245 F.2d 344, 346 (5th Cir.), *cert. denied,* 355 U.S. 863, 78 S.Ct. 95, 2 L.Ed.2d 68 (1957), and *Ford v. United States,* 201 F.2d 300, 301 (5th Cir. 1953), to the effect that cases of actual prejudice are an exception from the doctrine that failure to assert an objection to a juror until after the verdict waives the objection.

verdict.[13] As to any question of waiver, the court appeared to adopt a standard of actual knowledge of the misconduct. Judge Iredell concluded, "there is . . . cause, if it is proved that the juror was biased, to order [a new trial], after the verdict is pronounced, whatever delay or inconvenience may result therefrom; for that can be no reason to withhold a privilege to which a prisoner is entitled." *Id.* at 922.

In conclusion, we hold that appellant is entitled to a new trial in the circumstances of the present case. We emphasize that the district judge found the juror so biased against appellant that the juror did not in fact decide the case on the basis of an impartial consideration of the evidence. Our holding should in no way be taken as embodying an arbitrary rule that all expressions of bias, for example, against criminals in general, would be grounds for a finding that a juror was not impartial. *See United States v. Hendrix*, 549 F.2d 1225 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). *Cf. United States v. Shahane, supra*, 517 F.2d 1173 (no abuse of discretion by district court in finding juror impartial despite juror's expressions of bias against drug users and of disapproval of appearance of defendant's counsel). We do not in any way condone the conduct of appellant's counsel in failing to raise the issue earlier or in other omissions. *See* note 9 *supra.* We observe finally that appellant and counsel here, as in the *Fries* case, had hearsay reports but no direct proof of the juror misconduct prior to the verdict. *Cf.*

*Morris v. United States*, 26 F.2d 444, 449 (8th Cir. 1928) (motion for disqualification of judge held timely although defendant had known of possible grounds for "a considerable time" previous to the motion).

## Double Jeopardy

■ Appellant next argues that his conviction on both RICO counts would amount to double jeopardy, because both counts allege the same offense, participation in the same enterprise (the county judge's office) through the same "pattern of racketeering activity," i. e. a bribery and kickback pattern.[14] The double jeopardy clause would of course prohibit double punishment for the same offense, but we are of the view that the two counts do not allege the same offense under RICO. We therefore remand both RICO counts, as well as the Travel Act counts, for retrial.

As the Supreme Court has explained,

It is Congress . . . which establishes and defines offenses. Few, if any, limitations are imposed by the Double Jeopardy Clause on the legislative power to define offenses. *Brown v. Ohio*, 432 U.S. 161, 165 [97 S.Ct. 2221, 2225, 53 L.Ed.2d 187] (1977). But . . . Congress has defined a statutory offense by its prescription of the "allowable unit of prosecution," *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 [73 S.Ct. 227, 229, 97 L.Ed. 260] (1952); *Bell v. United States*, 349 U.S. 81 [75 S.Ct. 620, 99 L.Ed. 905] (1955); *Braverman v. United States*, 317

---

**13.** *Cf. United States v. Shahane*, 517 F.2d 1173 (8th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975) (where defendant brought a rumor of potential juror bias to the attention of the court during trial, the trial court decided to allow the trial to proceed and suggested the defendant could raise the issue after the verdict if it was unfavorable.)

**14.** Appellant also urges that his conviction both for Travel Act violations and also for a violation of RICO based on the Travel Act violations as racketeering activity would violate double jeopardy under the principle of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We reject this contention. Each statutory offense includes an element not required to prove the other offense, *i. e.* the defendant's participation in an enterprise under

RICO and use of a facility in interstate commerce under the Travel Act. *Cf. United States v. Boylan*, 620 F.2d 359 (2d Cir.), *cert. denied*, — U.S. —, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980) (no double jeopardy in convictions arising out of same transactions for violations of both RICO and the criminal provisions of the Labor Management Relations Act, 29 U.S.C. § 186(b)(1)); *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979) (convictions under both RICO and 18 U.S.C. § 894), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Prince*, 529 F.2d 1108 (6th Cir.), *cert. denied*, 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976) (convictions under both the Travel Act and the Mann Act, 18 U.S.C. § 2421).

U.S. 49 [63 S.Ct. 99, 87 L.Ed. 23] (1942); *In re Nielsen,* 131 U.S. 176 [9 S.Ct. 672, 33 L.Ed. 118] (1889).... Whether a particular course of conduct involves one or more distinct "offenses" under the statute depends on this congressional choice. *Sanabria v. United States,* 437 U.S. 54, 69–70, 98 S.Ct. 2170, 2181–2182, 57 L.Ed.2d 43 (1978) (footnote omitted). *See generally* Westen & Drubel, *Toward a General Theory of Double Jeopardy,* 1978 Sup.Ct.Rev. 81, 113–19; Note, *Twice in Jeopardy,* 75 Yale L.J. 262, 311–13 (1965).

The language of RICO itself, however, does not reveal what Congress envisioned as the allowable unit of prosecution. The statutory words would support at least four interpretations of the allowable unit of prosecution under RICO. The statute proscribes conducting or participating in enterprises affecting commerce through a pattern of racketeering activity. 18 U.S.C. § 1962(c). A pattern of racketeering activity is in turn defined as two or more of certain specified criminal acts. 18 U.S.C. § 1961(5). By focusing on various aspects of the statute, one could consider the minimum allowable unit of prosecution as (1) the corruption of a particular enterprise (i. e. one enterprise, one RICO count); (2) each part of the corrupt activity which has an independent nexus to interstate or foreign commerce (i. e. one injury to commerce, one RICO count); (3) each pattern of racketeering activity which amounts to a distinguishable instance of conduct or participation in the affairs of an enterprise (i. e. one pattern, one RICO count); or (4) each pattern of racketeering activity, defined as any two or more racketeering acts (i. e. one RICO count for every two racketeering acts).

Appellant expresses the concern that, if we do not recognize the participation in a given enterprise as the allowable unit of prosecution, we of necessity would permit a RICO count for every two racketeering acts. We do not reach that issue because the prosecution has charged only two counts of RICO, one arising out of appellant's transactions with Baldwin and the other out of transactions with Pratt. The various possible readings of the statutory words, however, do provide a background for the statutory interpretation problem we address in determining whether the two charges in this case involved different units of prosecution under RICO. But the words of the statute itself are ambiguous and provide no firm basis for choosing between interpretations holding the statutory unit of prosecution to depend upon the number of enterprises corrupted or upon the number of distinct patterns of corruption.

We turn to the legislative history for resolution of the ambiguity, keeping in mind that, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." *United States v. Universal C.I.T. Credit Corp., supra,* 344 U.S. at 221–22, 73 S.Ct. at 229. "[A]mbiguity should be resolved in favor of lenity." *Bell v. United States, supra,* 349 U.S. at 83, 75 S.Ct. at 622. The ambiguity can be resolved in favor of the interpretation allowing a greater number of prosecutory units only where the legislative history evinces an intent clearly supportive of the harsher alternative. *See Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958).

The legislative intent concerning the allowable unit of prosecution may of course appear in the form of legislative history specifically setting forth the Congressional expectation of the allowable unit of prosecution. But the inquiry also requires consideration of the legislative history as a whole, because the allowable unit of prosecution is integrally related to the questions of what evil Congress sought to address and how the statutory scheme combats the evil. For example, absent any legislative history under the federal narcotics acts specifically explaining whether given conduct would support single or multiple prosecutions, the

Supreme Court found an intent to allow multiple prosecutions, where the statutory scheme involved "a network of provisions, steadily tightened and enlarged, for grappling with a powerful, subtle and elusive enemy." *Gore v. United States*, 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958). That is, where Congress enacted multiple provisions that would penalize different aspects of the same course of conduct, it could be inferred that Congress meant to allow multiple punishments for a single course of conduct.

Giving full weight to the rule of lenity, we still perceive an unmistakable Congressional purpose to allow a separate unit of RICO prosecution for each distinct pattern of racketeering activity. Supporters of the RICO legislation, explaining its operation during the Congressional debate, shared the view that the evil to be punished was the pattern of racketeering activities and its injection into legitimate enterprises, not the conversion of legitimate enterprises into corrupt ones.[15] "[T]he provisions of [RICO] operate largely against ... patterns of racketeering activity." 116 Cong.Rec. 35295 (1970) (remarks of Rep. Poff). "[RICO] makes it a crime to use organized crime ... methods to ... operate any legitimate business." *Id.* at 35304 (remarks of Rep. Railsback). The crime is "to operate ... a business [engaged in interstate commerce] by racketeering activities ...," *id.* at 36294 (remarks of Sen. McClellan), or

"activities of criminals and their influence in supposedly legitimate businesses," *id.* at 953 (remarks of Sen. Thurmond).[16] The criminal penalties of the statute are aimed therefore not at those who are members of corrupted organizations but at those using the pattern of racketeering activity to operate the business. 18 U.S.C. § 1962(c). Likewise, the criminal forfeiture section of the statute may deprive the person who has engaged in the racketeering activity of his interest in the enterprise, 18 U.S.C. § 1963(a),[17] but the section does not directly refer to any forfeiture by the corrupted enterprise.[18]

■ Finally, the statutory scheme is one that multiplies punishments for the proscribed conduct. The RICO punishment is predicated on the operation of an enterprise through racketeering activity defined to include only conduct that is otherwise punishable as a state or federal crime. Justice Frankfurter's analysis in *Gore* is fully applicable to RICO: "If the legislation reveals anything, it reveals the determination of Congress to turn the screw of the criminal machinery ... tighter and tighter." 357 U.S. at 390, 78 S.Ct. at 1283. It would not be consistent with this basic purpose to read too readily into the act limitations preventing punishment for each instance of the evil Congress sought to address. That evil was the use of a pattern of racketeering activity as a means of operating an enterprise. We conclude that RICO includes a separate unit

---

**15.** Although statements on the floor by legislators are not always the most persuasive indicia of legislative intent, the statements we rely on in this case are not isolated comment by individual legislators but rather indications of agreement among the sponsors and supporters of the legislation as to its central purpose. *Cf. American Sm. & Ref. Co. v. OSAHRC*, 501 F.2d 504, 509–10 (8th Cir. 1974) (comment by individual legislator not controlling).

**16.** Some legislators also did express support for the legislation as an attack on corruption of legitimate businesses and public officials. *See* 116 Cong.Rec. 601 (1970) (remarks of Sen. Hruska); *id.* at 603 (remarks of Sen. Yarborough); *id.* at 962 (remarks of Sen. Murphy). Although these statements show that one goal of the act was to free enterprises from the taint

of racketeering activity, the legislators cited in the text who explained how RICO would attain that end all focussed on the penalization of the pattern of racketeering activity used to corrupt an enterprise.

**17.** 18 U.S.C. § 1963(a) provides for anyone committing unlawful racketeering activities under RICO to "forfeit to the United States (1) any interest he has acquired or maintained in violation of [RICO], and (2) any interest in ... any enterprise which he has ... participated in the conduct of, in violation of [RICO]."

**18.** Sen. McClellan did remark, "In some cases the organization will no doubt be so corrupt that it will have to be dissolved." 116 Cong. Rec. 592 (1970).

of prosecution for each distinct pattern of racketeering activity.[19]

■ The question remains whether the two RICO counts in this case charged two distinct patterns of racketeering activity. The critical statutory word—pattern—"is relatively new to the legislative criminal lexicon," *United States v. Stofsky*, 409 F.Supp. 609, 613 (S.D.N.Y.1973), *aff'd*, 527 F.2d 237 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). Courts and commentators have wrestled with the difficulties in defining the requisite "pattern" of activity under RICO,[20] but not with the question of what conduct is divisible into more than one distinct pattern of racketeering activity.

The closest analogue we have found to the problem before us is the question of whether certain conduct comprises one or more criminal conspiracies. *See Arnold v. United States*, 336 F.2d 347 (9th Cir. 1964), *cert. denied*, 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965); *Short v. United States*, 91 F.2d 614 (4th Cir. 1937). A RICO charge focusses upon the "pattern" formed by a number of unlawful acts, while a conspiracy charge focusses upon the agreement formed by persons to do unlawful acts. Thus, a RICO charge, like a conspiracy charge, focusses upon a relation between various elements of criminal activity rather than a single criminal act. Determination in a given case of the number of patterns or agreements requires examination of the four corners of the charges. The cases have employed five factors to make this determination in conspiracy cases, and similar factors appear to us relevant in the RICO context: (1) the time of the various activities charged as parts of separate patterns; (2) the identity of the persons involved in the activities under each charge; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity the government seeks to punish under each charge; and (5) the places where the corrupt activity took place under each charge. *Cf. Arnold v. United States, supra*, 336 F.2d at 350 (factors in conspiracy case).

Applying these factors in this case we find that the two RICO counts involved distinct patterns of racketeering activity. The two counts involved activity taking place during different time periods. Under one count, unlawful acts allegedly occurred between January, 1974, and May, 1977; under the other count, between October, 1977, and July, 1978. Different persons were involved in the racketeering activity alleged under the two counts. One count is based on alleged transactions between appellant and Baldwin; the other is based on transactions between appellant and Pratt.

The nature and scope of the activity was somewhat different under each count. The purchases from Baldwin of "corrugated metal culverts and other items" allegedly involved a scheme whereby appellant would receive kickbacks on invoices for material delivered to the county by Baldwin and also

---

19. Our conclusion is consistent also with the holding of *United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). In *Anderson*, we concluded that, because an enterprise is an essential element of a RICO violation under 18 U.S.C. § 1962(c) separate from the pattern of racketeering activity, the enterprise must embody a lawful or unlawful "discrete economic association existing separately from the racketeering activity." *Id.* at 1372. Although an enterprise is an essential element of a RICO violation under § 1962(c), however, that does not mean only one violation can be found for each enterprise. Rather, because the pattern of racketeering activity is under *Anderson* necessarily a separate element of each offense, each distinct pattern of activity will support a separate charge under § 1962(c) regardless of the identity of the enterprise involved.

20. *See United States v. Weisman*, 624 F.2d 1118 (2d Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Weatherspoon*, 581 F.2d 595 (7th Cir. 1978); *United States v. Frumento*, 409 F.Supp. 136 (E.D.Pa.1976), *aff'd*, 563 F.2d 1083 (3d Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978); *United States v. Stofsky, supra*, 409 F.Supp. 609. *See generally* Bradley, *Racketeers, Congress, and the Courts: An Analysis of RICO*, 65 Iowa L.Rev. 837, 861 (1980); Note, 33 Vand.L. Rev. 441, 450 (1980).

on "bogus invoices" for material never delivered to the county. The purchases from Pratt also involved alleged kickbacks for materials delivered to the county, but no submission of "bogus invoices" for the materials, "diesel fuel additives, gasoline additives, motor oil, hydraulic and cleaning compounds, degreaser and other such products" —different types of materials than were allegedly involved in the Baldwin transactions. Finally, the corrupt activity involved transactions between the county and vendors in different geographical locations. The Baldwin transactions involved alleged county purchases from a vendor located in Georgia or Tennessee; the Pratt transactions involved purchases from a vendor located in Texas.

On the other hand, there is an undeniable similarity between the patterns of activities under the two RICO counts: all the activities allegedly involved the same crime of bribery under the Arkansas statutes [21] and the federal Travel Act.[22] But this similarity alone does not mean that all the acts charged were part of a single pattern. Although both patterns were made up of the same kind of criminal activity, each pattern involved a different time period, a different vendor in a different geographic location, different materials which would not necessarily affect the same parts of the county's operations. All in all, the charges involve two distinct patterns of bribery rather than one.

We therefore conclude that charging appellant with two counts of RICO in the circumstances of this case would not violate the double jeopardy clause of the fifth amendment. We are mindful of the Supreme Court's admonition that, "The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal

and spatial units." *Brown v. Ohio, supra,* 432 U.S. at 169, 97 S.Ct. at 2227. But the Supreme Court has never held that principle to preclude multiple charges for each distinct offense made criminal by the legislature, and this court has rejected a rule that would bar multiple prosecutions for distinct offenses simply because of their proximity or similarity. *See, e. g., Moton v. Swenson,* 488 F.2d 1060 (8th Cir. 1973), *cert. denied,* 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974); *United States v. Bandy,* 421 F.2d 646 (8th Cir. 1970).

*Admissibility of Income Tax Returns*

Appellant also contends that the district court erred in admitting into evidence the tax returns of a business conducted by appellant, Frank Dean Farms, Inc. Appellant testified about his farming business on direct examination. The trial court admitted the first page of the business tax returns for the years 1974 through 1978 inclusive [23] as relevant in impeaching appellant's testimony which tended to give the impression of successful farming activities, and also as relevant in tending to show financial losses of appellant's business as a possible motive for appellant's alleged acceptance of bribes. Appellant argues that the profit and loss figures from the business tax returns do not reflect the actual financial status of the farming business.

We have little doubt that evidence of financial losses in appellant's business would have probative value in establishing a motive for the alleged bribery. *Cf. United States v. King,* 560 F.2d 122 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977) (business losses admitted in securities fraud case); *United States v. Houlihan,* 332 F.2d 8 (2d Cir.) (mail and wire fraud and interstate transportation of stolen securities), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964). But we think the government must also show some

---

21. *See* note 3 *supra.*

22. *See* note 4 *supra.*

23. The returns were admitted to show that the business showed under tax accounting principles a loss of $144,330 in tax year 1974, a profit

of $71,786 in 1975, a profit of $32,740 in 1976, a loss of $123,474 in 1977, and a profit of $209,-672 in 1978. The evidence also indicated that Dean was paid wages from the business of $18,000 in tax year 1974, $36,000 in 1975, $24,-000 in 1976, 0 in 1977, and $24,000 in 1978.

reasonable basis for inferring actual financial losses from the figures shown on the business' tax return. The income tax return summarizes appellant's financial condition over a one-year period of time which may give an arbitrarily limited picture of the financial health of a business. (For example, in this case a corporate loss of $123,474 in 1977 was followed by a profit of $209,672 in 1978.)[24] The ability to withstand repeated losses may be a sign of financial strength rather than weakness. Finally, of course, the internal revenue laws may impose accounting rules very different than those normally used to determine the financial health of a corporation. All these factors tend to attenuate the connection between the business tax return and the financial status of appellant. Nevertheless, admission of the tax returns in this case may compel appellant, who is accused of crimes involving submission of false invoices, to put on evidence that he submitted a tax return that did not reflect his actual financial condition. The potential for confusing the jury on matters very prejudicial to appellant is apparent. Moreover, the record indicates that in this case the government could have established without using the tax returns the financial condition of appellant's business, for example, through the corporation's bank records or books.

The cases have recognized the potential for abuse in admission of income tax returns.[25] In *United States v. Williams*, 613 F.2d 560 (5th Cir. 1980), a drug prosecution, the defendant offered his income tax return as evidence he had derived his income from an upholstery business, not from the sale of controlled substances as alleged by the government. The Fifth Circuit affirmed the district court's refusal to admit the evi-

dence, and commented, "whatever probative value lay in the tax returns was miniscule and the potential for mischief was substantial." *Id.* at 563. In *Courtney v. United States*, 390 F.2d 521 (9th Cir.), *cert. denied*, 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed.2d 126 (1968), the defendant, accused of coercing women into prostitution and taking their earnings, denied that he had received any money from them and claimed instead to have made his living as an entertainer. The government introduced for impeachment purposes evidence that the defendant had failed to file an income tax return during the relevant time period. The Ninth Circuit held that the district court had abused its discretion in admitting the evidence, because "[a] jury should not be permitted to speculate that appellant received income from sordid sources because of his failure to file an income tax return, especially where it is conceded that he received income from non-sordid sources upon which he paid no tax and filed no income tax return." *Id.* at 530. Likewise in this case the connection is weak between the losses shown on the tax return and the actual financial state of appellant's business, at least absent some additional showing that the tax return is an accurate reflection of the business' actual financial condition.

In the circumstances of this case we have deep reservations about the admissibility of appellant's income tax returns. The admissibility of evidence, however, is a matter within the district court's discretion, *United States v. Johnson*, 605 F.2d 1088 (8th Cir. 1979) (per curiam); *United States v. Green*, 600 F.2d 154 (8th Cir. 1979) (per curiam); *United States v. Adcock*, 558 F.2d 397 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). We do not know

**24.** Also in 1974, appellant drew a salary from the business even though it showed a loss. *See* note 23 *supra*.

**25.** A similar question has arisen in regard to the admissibility of income tax returns to show business losses in cases where an insurer defends against a fire loss claim on the basis that the insured set the fire and was motivated by the losses. In such circumstances appellate courts have upheld the trial court's exercise of

discretion in excluding or admitting such evidence. *Compare State Farm Fire & Cas. Co. v. McFerrin*, 382 F.2d 282 (5th Cir. 1967), *cert. denied*, 390 U.S. 953, 88 S.Ct. 1045, 19 L.Ed.2d 1145 (1968) (tax returns not admitted), *with Esquire Restaurant, Inc. v. Commonwealth Ins. Co.*, 393 F.2d 111 (7th Cir. 1968) (tax returns admitted), *and McIntosh v. Eagle Fire Co.*, 325 F.2d 99 (8th Cir. 1963) (tax returns admitted).

whether the government will attempt to use the tax returns as evidence on remand or what circumstances may arise bearing on their admissibility. We therefore pretermit any conclusion on the question pending further proceedings in this case.[26]

*Other Issues*

■ Appellant makes a number of other contentions which require only brief consideration. Appellant contends for the first time on appeal that the indictment failed to charge that appellant conducted or participated in an "enterprise" through a pattern of unlawful activity under RICO, because the "enterprise" charged in the indictment —"the office of County Judge of Poinsett County, Arkansas"—is nothing more than "an unfilled state elective office." Brief of Appellant at 8. Appellant contends that, "[b]ecause no proof was offered at trial as to exactly how 'the office of County Judge of Poinsett County' became an 'enterprise,' it is a little difficult to accurately set forth the government's contention." *Id.* We regard this argument as specious in view of the fact that in the district court all parties interpreted the word "office" to mean a division or department of the county government, not "an unfilled elective position." Appellant testified,

Q. [by Mr. Pickens, appellant's attorney] At the time you went out of office,

how much staff did you have as county judge?

A. [by appellant] In the office proper?

Q. Office proper.

A. Three secretaries.

Appellant himself regarded his office not merely as his elective position but as an operating entity within the county government which included at least three other persons.[27] Thus, the indictment charged and the jury could have found[28] that the office was an enterprise, which is defined under the RICO statute as "including any . . . association or other legal entity, and any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).[29]

■ Appellant also contends that the district court erred in instructing the jury that "the term pattern of racketeering activity *means* at least two acts of racketeering activity." (Emphasis added.) The statutory definitions state that a "pattern of racketeering activity *requires* at least two acts of racketeering activity . . . ." 18 U.S.C. § 1961(5) (emphasis added). In appellant's view, by changing the word "requires" in the statute to the word "means" in the instruction, the district court removed from the jury's consideration the essential factual element of "a *pattern* of racketeering activity" under the RICO offense. 18 U.S.C. § 1962(c) (emphasis added). The

---

**26.** Appellant also claims the government's evidence of gambling trips by him should have been excluded on grounds that its prejudiciality outweighed its probative value. The district court admitted evidence of one gambling trip but ruled evidence of a second trip to be cumulative and unduly prejudicial. We doubt the district court abused its discretion. *See United States v. Kwitek,* 467 F.2d 1222 (7th Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972). Other points raised by appellant raise issues that may not arise in a new trial and we see no value in any discussion at this time.

**27.** Appellant testified also

. . . in 1967, our government wasn't nearly as large as it is now. And I tried to run it as a business . . .

But after three or four years in office, the Government got bigger . . . .

And then I had to change my operation. . . . I tried to run it like an industry,

where I had department heads and different foremen and different people for different jobs.

**28.** The district court left it to the jury to find whether the office of county judge was in fact an "enterprise" under the statutory definition. Appellant requested no instruction defining the word "enterprise" further.

**29.** Appellant does not argue on appeal that a governmental entity cannot be an enterprise under RICO. It was his position that, because the words "office of county judge" could not describe an enterprise under RICO for reasons addressed in the text, this court does not need to decide in this case whether a governmental entity could be a public enterprise. We note that the issue is presently pending before this court in *United States v. Clark,* —— F.2d —— (8th Cir., *filed Apr. 17,* 1981).

argument is that Congress did not fully define "pattern of racketeering activity" in § 1951(5), but rather provided only a partial contextual definition [30] by placing the words from § 1962 in another context which would demonstrate one aspect of their meaning. Section 1961(5) does not say what the "pattern of racketeering activity" is, only what it "requires." Arguably, Congress did not thereby obviate under RICO the explicit definition [31] of the word "pattern," including the connotation of "continuity plus relationship," S.Rep.No.617, 91st Cong., 2d Sess. 158 (1969).[32] Appellant, however, failed to object to the instructions at the time they were given by challenging either the wording of the instruction given or the failure to give an instruction setting forth the explicit definition of the word "pattern." We therefore do not address appellant's contention at this time.

For the reasons stated above, the judgment of the district court is reversed and the case is remanded to the district court for a new trial.

BRIGHT, Circuit Judge, dissenting.

I dissent from the grant of a new trial to the defendant. The record in this case unequivocally demonstrates that both defendant and his lawyer learned of the juror's misconduct before the jury retired to consider the evidence, but elected to gamble on the return of a favorable verdict by remaining silent. Under these circumstances, defendant cannot now be heard to complain that the juror's misconduct prejudicially influenced the jury's verdict. In accordance with the long-established decisions of this court, therefore, the district court did not abuse its discretion in vacating its order granting defendant's motion for a new trial.

The district court initially granted defendant's motion for a new trial because one juror's preverdict statements evinced "a settled disposition on the part of the juror to convict the defendant regardless of the evidence." *United States v. Dean*, Nos. J-CR-79-1 and J-CR-79-10, slip op. at 6 (E.D.Ark. Sept. 26, 1979). Upon the Government's motion for reconsideration, however, the district court vacated its order for a new trial and reinstated the guilty verdict. After a thorough evidentiary hearing, the court found that both defendant and defense counsel knew of the alleged juror bias before the close of trial, that neither brought this information to the court's attention or sought any preverdict relief to insure a fair trial before the jury convicted defendant, that defense counsel unjustifiably delayed in apprising the court of the juror misconduct, and that the court could have substituted an alternate juror for the biased juror had it been informed of the juror's prejudice. *United States v. Dean*, Nos. J-CR-79-1 and J-CR-79-10, slip op. at 4-5 (E.D.Ark. Oct. 11, 1979).

The majority does not dispute these findings. Nevertheless, it concludes that the "order for a new trial must be reinstated as an exercise of our supervisory power over the administration of justice in this circuit." At 783. As justification for this conclusion, the majority stresses the existence of "actual, not potential, juror bias" in this case and the availability of some "appropriate forum" to remedy counsel's lack of diligence in raising the question of juror bias.

---

**30.** A contextual definition is "a definition in which the meaning of a word . . . is partly or wholly determined by defining the meaning of a larger expression containing the [word to be defined] (as a definition of a legal right by the statement 'X had a *legal right* to Y = X has a claim upon somebody for possession of Y which the courts will sustain.')." Webster's Third New International Dictionary 492 (1966).

**31.** An explicit definition is "a definition giving an exact equivalent for the term defined." *Id.* at 801.

**32.** Authorities collected in note 20 *supra* divide on the issue. The Senate report stated:

> The concept of "pattern" is essential to the operation of the statute. . . . The target of [RICO] is . . . not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a *pattern.*

S.Rep.No.617, at 158.

*At 783.* Neither ground, in my view, justifies a new trial for defendant.

The majority first distinguishes our previous decision denying a new trial for juror misconduct as cases "with a potential for affecting impartiality, but not cases in which a juror was actually biased." *At 783.* All of these decisions, however, focused on two factual matters: (1) the timeliness of objection once the defendant learned of alleged juror misconduct during the trial; and (2) the degree of prejudice that likely flowed to the defendant from the juror misconduct. Only after the defendant established the timeliness of his objection to the alleged misconduct did the degree of bias—actual or potential—become critical to the defendant's right to a new trial. *See United States v. Sorenson,* 611 F.2d 701, 702 (8th Cir. 1979) ("[O]bjections based on juror misconduct during the trial cannot be raised for the first time on appeal when counsel did not apprise the trial court of the alleged misconduct at trial."); *United States v. Nance,* 502 F.2d 615, 621 (8th Cir. 1974) ("A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains."), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975); *United States v. Hester,* 489 F.2d 48, 50 (8th Cir. 1973) ("Hester, failing to apprise the trial court of this alleged misconduct, should not be allowed to inject 'a defect into the trial, and later claim its benefit.' ").

The majority contends, however, that, "The way to address counsel's unjustified delay in raising the question of juror bias is to proceed against counsel in an appropriate forum." *At 783.* This contention ignores the district court's explicit finding that *both* defendant and defense counsel knew of the allegations of juror misconduct before the jury retired to consider its verdict. The majority does not disturb this finding, nor does it expressly set aside the district court's finding that defendant received a fair trial under the totality of the circumstances.

For these reasons, I would sustain the district court's decision to vacate its order granting defendant's motion for a new trial.

Further, I express disagreement with the majority's disposition of defendant's contention that the office of county judge cannot be a "legal entity" and, therefore, the "enterprise" necessary to a RICO prosecution. The district court, with the majority's approval, left it to the jury as a factual matter to determine whether the office of county judge was an "enterprise" within the meaning of the RICO statute, 18 U.S.C. § 1961(4) (1976).

In my view, however, the definition of a statutory term presents a question of law, not a question of fact that may be resolved solely through a review of the evidence. Section 1961(4) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity." Under this definition, the office of county judge would be an "enterprise" only if it is an "other legal entity." Defendant argues that the office of county judge cannot be a "legal entity" because it lacks legal capacity to sue or be sued. Further, he argues that the *ejusdem generis* rule of statutory interpretation would limit the meaning of "other legal entity" to identities similar in nature to the words preceding the phrase in the statutory definition. These words—individual, partnership, corporation, and association—differ significantly in their characteristics from a governmental office.

Moreover, Congress specifically defined "State" in the RICO statute to include "any political subdivision, or any department, agency or instrumentality thereof," 18 U.S.C. § 1961(2), but made no mention of "State" or "any instrumentality thereof" in its definition of "enterprise."

Although I entertain considerable doubt as to the validity of the majority's disposition of defendant's conviction under the RICO counts, this issue comes to us only in the posture of a contention that the term "office" cannot be a "legal entity" under the statute. Defendant does not dispute in this case that a public body may constitute a legal entity. *See at 791 n.29.* Because the scope of RICO presents an important issue not fully briefed or raised in this

appeal and because defendant received a concurrent sentence on the Travel Act and RICO counts, I would leave the issue for another day in a more appropriate case.

Accordingly, I would affirm defendant's conviction without resolving the RICO question presented to us on this appeal. I also would sustain the district court's decision to vacate its order granting defendant's motion for a new trial.